## SECURITIES AND EXCHANGE COMMISSION v. ALDRED INV. TRUST et al.

### STRATTON v. SAME.

### Nos. 2805, 2708.

District Court, D. Massachusetts.

Jan. 19, 1945.

Phipps, Durgin & Cook, R. A. B. Cook, and J. N. Welch, all of Boston, Mass., for plaintiff Stratton.

Tyler & Reynolds, and George B. Rowlings, all of Boston, Mass., for interveners H. Isaiah Smith and Arthur P. Hudson.

Philip A. Chapman, of Boston, Mass., for interveners Philip A. Chapman et al.

Edward H. Cashion, of Philadelphia, Pa., E. Russell Kelly, of Baltimore, Md., Sidney Manster, Mayer U. Newfield, and Emanuel Bublick, all of Philadelphia, Pa., and Frank Kopelman, of Boston, Mass., for plaintiff Securities and Exchange Commission.

Hugh D. McLellan and William J. Hession, both of Boston, Mass., for defendants Aldred Inv. Co. et al.

SWEENEY, District Judge.

In both of these actions the appointment of a receiver and the liquidation of the trust is sought. In civil action No. 2805, hereinafter referred to as the "S.E.C. case", an injunction is also sought against the defendants continuing to act as trustees or officers of the defendant trust. Civil action No. 2708, hereinafter referred to as the "Stratton case", was brought by a de-

benture holder who was a resident of the State of New York, and jurisdiction is based on diversity of citizenship. In the S.E.C. case, jurisdiction is based upon an alleged violation of the Investment Company Act of 1940. 15 U.S.C.A. § 80a. The Stratton case was heard some months ago and decision on the merits was withheld pending the hearing of the S.E.C. case. At the hearing of the S.E.C. case the parties stipulated that all of the testimony, depositions, and exhibits received in evidence in the Stratton case were to be incorporated into and added to the testimony presented in the S.E.C. case. By reason of this stipulation the S.E.C. case now covers everything contained in the Stratton case with an additional charge of a violation of the Investment Company Act of 1940, supra, with a prayer for relief under that Act. The specific charge in the S.E.C. case is that these defendants, as officers or trustees of the Aldred Investment Trust, have been guilty of gross misconduct or gross abuse of trust within the meaning of Section 36 of the Act. 15 U.S.C.A. § 80a—35.

### Findings of Fact

The Aldred Investment Trust, hereinafter referred to as the Trust, is registered with the Securities and Exchange Commission pursuant to Section 8 of the Investment Company Act of 1940. 15 U.S.C.A. 80a—8, as a closed-end, nondiversified management investment company. The Trust was organized in 1927 as a common law trust under the laws of the Commonwealth of Massachusetts. In the agreement and declaration of trust it is provided that legal title, complete management and investment discretion, and absolute control of the Trust is vested in the trustees who organized the Trust and in their successors. A majority of the trustees or the holders of 25% of the common voting shares may at any time call a shareholders' meeting, at which meeting a majority of such shares may supersede or re-elect the trustees in office or fill any vacancy. Under the agreement and declaration of trust the shareholders are not entitled to put an end to the Trust or to require a division of the Trust estate, or any part thereof, until the expiration of seventy-five years from the formal date of the trust agreement or the expiration of twenty-one years from the death of the last survivor of designated measuring · lives. The trustees have a discretionary power to terminate the Trust earlier by an in-

strument in writing signed by all of the trustees. In addition, the trust agreement provides that no investment shall be deemed improper because of its speculative character, or the commitment therein of an unusually large proportion of the Trust estate, or because the trustees or officers have an interest in, or stand to profit from, the investment.

During 1927 and 1928 the Trust sold to the public debentures maturing December 1, 1967, in the principal amount of $10,000,-000, bearing interest at the rate of 4½% per annum. To each debenture was attached one common share (no par value) of the Trust for each $100 principal amount of the debenture. The total number of nondetachable common shares so issued amounted to 100,000 shares. In addition, during 1927 and 1928 there were authorized and issued 112,500 free common shares not attached to any debentures, and these were issued to Aldred & Company, investment bankers, and sponsors of this Trust. The debentures contained a provision for acceleration of the due date of the principal sum for default in the payment of interest upon the written request of the holders of 25% in principal amount of the debentures.

By December 31, 1940, the Trust had acquired and retired $4,100,000 face amount of the debentures and 41,000 nondetachable common shares, leaving outstanding $5,-900,000 face amount of debentures with 59,000 attached common shares and 112,500 free common shares. All common shares, whether attached or free, have equal voting rights, share for share.

Between the years 1927 and 1943, inclusive, the Trust's investments were confined largely to the securities of well-known public utility and industrial companies, in most cases listed on securities exchanges and readily marketable. The annual reports of the Trust revealed to its security holders the character of the securities in its portfolio.

On August 14, 1941, the Trust filed with the Securities and Exchange Commission a registration statement pursuant to Section 8(b) of the Investment Company Act of 1940. In answer to item 38(a) of said registration statement, which required a description of the policy of the registrant with respect to investment in companies for the purpose of exercising control or management, it was stated: "It is the policy of the registrant not to make investments in companies for the purpose of

726

exercising control or management. The registrant, however, has no policy which limits the proportion of the voting securities of any one company which it may acquire, even though presumptive or actual control might result from such acquisition."

In answer to item 42(b) of the registration form, which required the Trust to describe its policy with respect to concentrating its investments in a particular industry or industries, it was stated: "Although the investments of the registrant are at present concentrated to a large extent in securities of public utility corporations (See Item 42(c)) it is the policy of the registrant in carrying out the policy of diversification described in Item 36(b) to effect a greater diversification of its investments among different industries. The registrant reserves freedom, however, to purchase securities of public utility companies from time to time even though each such purchase will necessarily involve a greater concentration in that industry than existed immediately prior to such purchase. The registrant does not intend to make investments in any other industry if immediately thereafter its investment in such industry would exceed in value 25% of the value of its total assets."

Since 1937 the market value of the assets of the Trust has been substantially less than the principal amount of the outstanding debentures. The following table indicates from 1937 to 1944, inclusive, the asset value for each $1,000 principal amount of outstanding debentures, i. e., the value of the assets that would be distributed to each $1,000 principal amount of debentures if the Trust were to be liquidated and its assets distributed to its security holders:

| As of December 31 | Asset value per $1,000 Debenture |
|---|---|
| 1937 | $712.00 |
| 1938 | 669.55 |
| 1939 | 687.78 |
| 1940 | 533.46 |
| 1941 | 362.66 |
| 1942 | 444.32 |
| 1943 | 559.98 |
| June 30, 1944 | 643.86 |

For the years 1940 to 1943, inclusive, the earnings of the Trust have been substantially insufficient to meet the interest requirements on its outstanding debentures. During this period the Trust paid out an aggregate of $1,062,945.13 as interest to the debenture holders of which $479,775.42 was derived from the sale of assets of the Trust.

In January, 1933, Aldred & Company pledged 110,000 common shares of the Trust with the Chase National Bank to secure an obligation of Aldred & Company to the bank. On October 1, 1941, the defendant Gordon B. Hanlon, proprietor and owner of Gordon B. Hanlon & Company, a securities broker dealer, purchased the 110,000 common shares for approximately $10,000 at a public auction conducted on behalf of the Chase National Bank as foreclosing pledgee. This block represented more than 60% of all the outstanding common shares of the Trust. At the time of Hanlon's purchase the market value of the Trust assets was substantially less than the face amount of the outstanding debentures, and the earnings of the Trust were insufficient to meet the annual interest requirements thereon. Although the common shares now held by Hanlon had no asset value, they constituted voting control of Aldred with the attendant power to elect and remove trustees and officers, to fix the compensation of the latter, and to dominate completely the policies of the Trust. The real value in these shares lay in their control of the Trust's policy, the Trust's assets, and the ability to direct the overhead management costs. Such control was in fact exercised by Hanlon through the selection of a group of close friends to serve as trustees. At all times the trustees have been subject to Hanlon's wishes and directions.

Shortly after the acquisition of control Hanlon caused a meeting of the shareholders of the Trust to be called at which the existing trustees were superseded by a new board of trustees consisting of Gordon B. Hanlon and his nominees, James M. Haynes, and the defendants Elton Hanlon, Loring and Bowen. In February, 1943, Haynes resigned and the defendant Higbee was elected by the remaining trustees to fill the vacancy.

Late in 1941 the trustees elected the defendant, Gordon B. Hanlon, president of the Trust, the defendant Arnold, vice president and treasurer, and the defendant, Loring, secretary. All of the defendants have continued in their positions as trustees or officers or both, except for the resignation of Gordon B. Hanlon as a trustee on January 17, 1944. The defendant Hart was elected to fill this vacancy. Hanlon, however, remained as president of the Trust.

During the year 1942 the officers received $9,249.99 as salaries, including $5,500 to Gordon Hanlon as president, the amount voted by the trustees. The trustees received $6,000 as compensation, this being provided for in the trust agreement. During 1943 the trustees' fees remained the same, but the salaries of officers were increased by the trustees to $11,700, including $6,900 to Hanlon. For the first half of 1944 trustees' fees were $3,000, and salaries of officers $5,850. Hanlon's salary as president was in excess of the salaries paid to the presidents of the Trust in prior years.

On November 19, 1941, Hanlon moved the offices of the Trust from their location in New York City to the offices of Gordon B. Hanlon & Company in Boston. The Trust was charged $410 per month by Hanlon for the use of office space and facilities which had hitherto been available to Gordon B. Hanlon & Company, plus the use of one additional adjoining room. Hanlon paid $40 per month to acquire this additional room. Payments by the Trust to Gordon B. Hanlon & Company for office facilities have been at the yearly rate of $4,920, and up to June 30, 1944, have totaled $12,874.

In January, 1942, Hanlon approached the Investment Company Division of the Securities and Exchange Commission and stated that the Trust's earnings were insufficient to meet the interest requirements on its debentures, and as a result the only alternatives were a liquidation or a recapitalization. He proposed a plan whereby the 4½% fixed interest debentures would be exchanged for 4½% income debentures. The interest was to be payable only if earned, and if not earned was to accumulate and become due and payable if subsequently earned or at the maturity date of the debentures. At this time Hanlon asked whether, if he attempted to consummate the proposed plan, the Commission would undertake to enjoin it pursuant to the authority vested in the Commission by Section 25(c) of the Investment Company Act of 1940. On January 31, 1942, the Commission in an informal meeting permitted him to outline the proposed plan. After the conference the Commission informed Hanlon that in its opinion the proposed plan was "grossly unfair" within the meaning of that phrase in the Investment Company Act of 1940, and that if he attempted to carry out such plan, it would be forced to institute proceedings under Section 25(c) of that Act to restrain its consummation.

In March, 1942, an amended plan was offered by Hanlon which provided, among other concessions by the common shares, that the debenture holders as a class would have the right to elect three of the five trustees of the Trust. In November, 1942, a further amendment was proposed which provided for the sterilization of 85,000 shares of the 110,000 shares of the common stock held by Hanlon so that they would have no voting power for the purpose of electing the trustees. These plans also were considered by the Commission as "grossly unfair" and injunction proceedings under Section 25(c) of the Investment Company Act were threatened if the plans were used.

None of the plans were ever actually submitted to the debenture holders by Hanlon. But in a proposed draft of a communication to the debenture holders, which Hanlon furnished to the Commission on November 20, 1942, comments were made on the investment soundness of certain securities in the portfolio of the Trust, including Pennsylvania Water & Power Company, Consolidated Gas Electric Light & Power Company of Baltimore, and Shawinigan Water & Power Company. The trustees considered these as "issues of excellent, outstanding utility properties" and advised against liquidation of the Trust's holdings of these securities. Although Hanlon's position had been that liquidation was the only feasible alternative to recapitalization, no recapitalization was effected and no plan for liquidation was ever proposed.

In 1943 Hanlon became interested in the acquisition of control of a horse or dog racing track, or a business corporation. In September, 1943, he was ready to invest $1,000,000 to obtain control of the New Hampshire Jockey Club, Inc., which operated Rockingham Park. He stated, in the course of these negotiations, that he wanted at least 90% of the stock. Failing in this, he attempted to purchase control of the Revere Racing Association which operated a dog track at Revere, Massachusetts. Again his object was a 90% interest, and he was ready to talk in terms of $2,000,000. Failing here also, Hanlon's next move was to offer $500,000 for 100% ownership of the stock of the Massasoit Greyhound Association, which operated the

dog track in Raynham, Massachusetts. Here again Hanlon was unsuccessful. I find that in all of these negotiations Hanlon was acting for and representing the Trust.

Early in December of 1943 Hanlon commenced negotiations with C. F. Adams and V. C. Bruce Wetmore, owners of the majority of the voting stock of Eastern Racing Association which operated the Suffolk Downs horse racing track in East Boston. As a result of these negotiations an option contract was signed on January 24, 1943, between Adams and Wetmore as sellers and the Trust as buyer of 14,471 shares of Eastern Racing Association at $80 per share, the total purchase price being $1,-157,620. Among the provisions of the option agreement appeared the following: "It is essential to the best interests of the Association that a dividend of not less than $2.50 per share and not more than $5.00 per share be paid in 1944 prior to March 31, 1944, on the stock of the Association and Buyer is to have the benefit of such dividend if it completes the purchase of the shares to be taken up at the closing time under this option agreement."

By February 18, 1944, the Trust had secured the required cash and the deal was consummated.

The acquisition of the control of this track, being a departure from their former investment policy, necessitated an amendment of the statement of policy with respect to investments as filed with the Securities and Exchange Commission. Such a deviation from the stated policy of the Trust had to be approved by a majority of the shareholders. In the latter part of December, 1943, notice of an annual meeting of shareholders was sent out. This postcard announced to the shareholders that the meeting would be held on January 24, 1944, for the purpose of taking action on the following matters:

"To see if the shareholders will ratify or reject the selection by the Trustees of Touche, Niven & Co. as independent public accountants to audit the accounts of the trust for the calendar year 1944.

"To consider and vote upon future investment policy for the Trust.

"To see if the share holders will vote to supersede or re-elect the Trustees now in office or any of them or elect a new Trustee or Trustees to fill any vacancy which may exist at the time of the meeting."

This notice was prepared by the defendants Arnold, Loring and Gordon B. Hanlon. I find that when this postcard was sent to the shareholders the defendants, except the defendant Hart, who was not then a trustee, knew that the registration statement filed with the Securities and Exchange Commission was to be subsequently amended to allow the Trust to acquire the controlling interest in another corporation. I further find that all of the defendants, except the defendant Hart, at this time contemplated the purchase of a controlling interest in Eastern Racing Association for the Trust.

On January 7, 1944, at a special meeting of the trustees of the Trust, it was unanimously recommended that the registration statement filed with the Securities and Exchange Commission be amended to permit the abandonment of the policy of diversification and the adoption of the policy of acquiring control of some corporation and actively managing such corporation. The trustees also authorized the defendants Hanlon and Arnold to dispose of 10,000 shares of Pennsylvania Water & Power Company, 5,000 shares of Consolidated Gas. Electric Light & Power Company of Baltimore, and 3,000 shares of Eastern Gas & Fuel Associates. At the meeting Hanlon discussed the results of studies carried on by him and by the defendant Arnold relating to a certain company, the name of which was disclosed in open meeting. The secretary Loring was directed not to record the name of the company in the minutes. Prior to the January 7 meeting the trustees had examined the figures of the company in question. I find that this company was the Eastern Racing Association.

At a special meeting on January 17, 1944, the resignation of Gordon B. Hanlon as trustee was accepted and Ezra D. Hart was elected to succeed him. This is the first time that Hart comes into the picture.

On January 24, 1944, at 9 A. M. the meeting of the shareholders was held, at which 110,090 shares out of a total of 171,500 shares outstanding were represented. By a vote of 110,050 shares, of which 110,000 shares belonged to Gordon B. Hanlon, a resolution was adopted to change the investment policy as recommended by the trustees. At this meeting no disclosure was made of an intention to purchase the race-

track. At 10:30 a. m. a second meeting was held at which Hanlon outlined the stage of the negotiations for Suffolk Downs and revealed that an option had been offered. This meeting was adjourned to 6 p. m. of the same day, at which time the authorization to sign the option agreement with Adams and Wetmore was given by the trustees.

To raise the cash required for the purchase of 50.3% of the voting securities of Eastern Racing Association the Trust sold between January 7 and February 7, 1944, more than 30% of the Trust's assets, including 10,000 shares of Pennsylvania Water & Power Company, 5,000 shares of Consolidated Gas Electric Light & Power Company of Baltimore, and 3,000 shares of Eastern Gas and Fuel Associates. The first two named securities were the very securities which Hanlon and the other trustees had advised against liquidating in 1942. Although Hanlon testified that these securities were sold because they were no longer attractive, I find that their sale was induced by the fact that, of all the securities in the Trust portfolio, these offered the best hope of quick liquidation to secure the funds for the purchase of Suffolk Downs.

On February 11 authorization was given by the trustees to take up the option. This was done on February 18.

While the negotiations for Eastern Racing were proceeding the trustees received an inquiry dated January 15, 1944, from one Quincy Cass, a broker, which said:

"Aldred Investment Trust
"100 Milk Street
"Boston, Massachusetts
"Gentlemen:

"We have a number of clients who are holders of Aldred Investment Trust bonds. One of these holders has been disturbed by the statement of a broker that the Aldred Investment Trust has changed its portfolio radically since its last published report. He has asked me to inquire if this is true. We would appreciate hearing from you, if there has been any portfolio changes of recent date.

"If you have calculated a market of fair value of your portfolio as of the end of 1943, we would apprecite that figure also.

"Very truly yours,

"QC:meh          Quincy Cass."

The reply of the Trust on January 18 was as follows:

"Quincy Cass Associates,
"523 W. 6th Street,
"Los Angeles 14
"California.

"Gentlemen: Attention: Mr. Quincy Cass

"We are unable to imagine where the broker, that you mentioned in your letter of January 15, 1944, received his information that Aldred Investment Trust had radically changed its portfolio since the June 30, 1943 report. We anticipate that the December 31, 1943 report will be distributed within a fortnight and while there have been some changes which occurred in the normal course of portfolio management, we feel sure that you will not consider changes radical in any sense of the word.

"The approximate fair value of the portfolio as at the end of the year 1943 was $3,221,580.

"We trust that this letter will answer the questions which you had in mind, but please do not hesitate to write us again should you desire any further information.

"Yours very truly,
"Aldred Investment Trust
"By J. L. Arnold
"JLA/C          Treasurer."

Even after negotiations for the track had been completed it is of interest to note the unwillingness of these defendants to give full information to the Aldred debenture holders. One such person late in March wrote in to inquire from the trustees as to the amount of their investment in Suffolk Downs. This inquiry brought forth a curt statement that such information could only be given out to all of the debenture holders at the same time and that necessarily the information would have to be withheld until the next semi-annual report.

On February 18 the defendants, through the Trust's control of Eastern, were elected as directors or officers of Eastern Racing Association. G. B. Hanlon, Higbee, Bowen, Hart and Loring were elected directors, and Hanlon was elected president, Arnold treasurer, and Loring, vice president, of Eastern Racing Association.

In acquiring control of Eastern Racing the defendants knew that Adams and Wetmore, as president and treasurer, respectively, had each received salaries of $25,-

000 per year and bonuses of an additional $25,000 each. Authority was then sought from the Wage Stabilization Board by Eastern Racing Association, acting through Hanlon, to create two new positions at Suffolk Downs, one as "Director of Racing" and the other as "General Manager and Comptroller". Both positions were to carry a salary of $20,800 per year. This authority was granted by the Board and Adams and Wetmore were hired in such capacities. In a statement supplementing the application, Hanlon represented to the Board that the salaries of the new president and treasurer would be so limited that the aggregate of all salaries paid by Eastern Racing Association would not exceed those previously received by Adams and Wetmore as salaries and bonuses. In granting the authority to create the two additional positions the Board expressly stipulated that the new president and new treasurer should not receive compensation in excess of $25,000 each. Such a limitation did not meet with Hanlon's approval. He sought return of his application on the ground that it omitted certain relevant information but the Board refused to allow its withdrawal. No salaries have thus far been voted by the directors of Eastern Racing to Hanlon or Arnold although the power to vote $25,000 to each still exists.

To acquire the controlling interest in Eastern Racing Association the Trust had to pay $80 per share. From November, 1943, through February, 1944, published bid prices for the common stock of Eastern Racing ranged between $52 and $59 per share.

Carrying the Eastern Racing investment at cost on its books, the Trust showed an asset value of $643.86 per debenture on June 30, 1944. If a $4 per share dividend paid by Eastern Racing on its common shares prior to the close of its fiscal year, March 31, 1944, is included in the gross income of Aldred, the Trust earned its interest requirements for the first six months of last year. However, Touche, Niven & Company, certified public accountants hired by the Trust, qualified their certification of the Trust's books by noting that $59,964 paid to Aldred by Eastern Racing before March 31 and earned prior to the date of acquisition of its stock by the Trust, should be applied against the cost of the investment. Under this construction there was a deficit for the six-month period of $33,522.91.

The horse racing business is subject to certain disabilities which other lines of endeavor do not encounter. Its operation is contingent upon the securing of a license from the Massachusetts State Racing Commission. The percentage of total handle taken by the track is limited by State law and there is continued agitation to reduce the share taken by the track. The Trust bought into Eastern Racing during wartime emergencies and the directors are properly charged with knowledge of the strong pressure then being exercised to close all horse racing tracks, or at least to curtail their operations. This threat has now become a reality. Furthermore, the County of Suffolk in Massachusetts conducts a quadrennial referendum on the horse racing question.

Section 36 of the Investment Company Act of 1940 empowers a district court of the United States to enjoin an officer or director of a registered investment company from acting in such capacity or capacities upon a finding that said officer or director has been guilty of "gross misconduct or gross abuse of trust." 15 U.S.C.A. § 80a—35. The interpretation of "gross misconduct or gross abuse of trust" as used in this section will depend not only upon relevant common law principles but also upon the findings and declarations of policy as set forth by Congress in Section 1(b) of the Act. Among the provisions of Section 1(b) is the following: "It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

Among the operating conditions and management activities which Congress enumerates in this section as contrary to the national public interest, and the interest of investors, are the following:

"(1) when investors * * * receive dividends upon, vote, refrain from voting, sell, or surrender securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and finanial responsibility of such companies and their management;

"(2) when investment companies are organized, operated, managed, or their

portfolio securities are selected, in the interest of directors, officers * * * rather than in the interest of all classes of such companies' security holders; * * *"

"(6) when investment companies are reorganized, become inactive, or change the character of their business * * * without the consent of their security holders."

██ The provisions of the agreement and declaration of trust which purport to grant unlimited investment discretion to the trustees do not relieve the defendants from the obligations and standards imposed upon them by the Investment Company Act of 1940.

When Hanlon purchased the control of the Trust the common shares had no equity position. The enterprise belonged to the debenture holders. Yet Hanlon's purchase enabled him to exercise dominion and control over the management and investment policies of the Trust. This dominion he has exercised by choosing and electing a slate of trustees which he knew would be, and in fact has been, amenable to his wishes.

Hanlon's management of the Trust has been calculated to further his own personal advantage. His salary as president has been in excess of the compensation paid to earlier presidents. The rentals of $410 per month paid to Gordon B. Hanlon & Company to all appearances yield an appreciable profit. There is no necessity for a finding that these expenses of the Trust are excessive in amount. If they are not excessive, they are quite substantial and their continuance makes it highly unlikely that Hanlon could appraise the prospects of liquidating the Trust with due regard for the interests of the debenture holders, or even view them disinterestedly. The whole course of the negotiations with the Securities and Exchange Commission indicates the reality of this conflict of interest. The Commission was unwilling to approve any recapitalization plan which would not leave the debenture holders in full control of the Trust, including the power to liquidate if such course seemed advisable. Although Hanlon represented to the Commission that liquidation was the only alternative to recapitalization, no proposal to liquidate was ever made. Hanlon, since he had no equity standing in the enterprise, could not gain by liquidating, and stood to lose the more than $10,000 per annum he was receiving from the Trust.

Furthermore, Hanlon, with the concurrence of the other defendants, has dictated policies with regard to the portfolio securities of the Trust which are contrary to the interests of the debenture holders. With the Trust unable to meet the interest requirements of the debentures from earnings the management has liquidated substantial amounts of high-grade portfolio securities to pay interest and management expenses. In reality, this is not interest to the debenture holders but is a return of the capital of the Trust in the guise of interest. Yet so long as the management sells portfolio securities of the Trust and distributes the proceeds to the debenture holders as ostensible interest, no technical act of default has occurred. The debenture holders are left helpless under the terms of the debenture agreement to halt the dissipation of their assets. As long as the personal advantage of Hanlon and the other defendants stood in the way the debenture holders could not expect relief either by way of bona fide recapitalization or liquidation.

Other securities transactions have been equally motivated by self-interest. Hanlon was attracted to Eastern Racing by the prospects of high salaries and other benefits for himself and his nominees. Large blocks of the best securities in the portfolio were thrown on the market at prices below those which probably could have been obtained through a more orderly process of disposal. With the funds from these forced sales Hanlon and the trustees were willing to pay $80 per share for Eastern Racing. This included some premium for control, and control was vital if the defendants were to reap full advantage from the transaction. An orderly process of lightening the Trust's holdings of certain securities, if such were honestly thought desirable, and the reinvestment in other issues without paying a premium for control would be more clearly in the debenture holders' interest. But the plans for personal gain would thereby have been frustrated.

Congress, in declaring the basic policy of the Investment Company Act, has stated that the national public interest and the interest of investors is adversely affected when investors are not given full information, fairly presented, of the company, its management and policies. If there was ever a duty to disclose completely their activities and intentions, these

732

defendants had such a duty in negotiating for control of Eastern Racing. The concentration of so large a proportion of the Trust's assets in one investment was a radical departure from the policy of diversification which had been previously followed, and from the declarations of policy set forth in the registration statement first filed with the Securities and Exchange Commission. The same is true of the investment in another company for the purpose of exercising control or management.

Furthermore, certain aspects of the Eastern Racing purchase itself make the duty of full disclosure particularly imperative. The horse racing industry is considered a questionable enterprise by large segments of the public. Investment trusts of the Aldred type do not have controlling blocks of racing stocks in their portfolios. The racing business is exposed to certain disabilities not encountered by other businesses. A premium for control was to be paid by the trustees. It may be conceded that Eastern Racing had a favorable tax position on forced liquidation, but this advantage would be lost with changes in the tax law or if the liquidation were not carried out. In view of the personal advantage to the defendants of continuing the track in operation such liquidation would be improbable. This factor was vital in appraising the desirability of the transaction and should have been fully revealed to the security holders.

This Court does not pass upon the wisdom of investments in racing stocks in general or the wisdom or technical legality under the agreement and declaration of trust of Aldred's investment in Eastern Racing. However, venturing the debenture holders' money under the circumstances indicated above did impose a duty of the highest character on the defendants to disclose to their investors the complete and accurate details of their intended course.

Instead of fulfilling this obligation to the holders of the debentures, the defendants pursued a positive program of concealment. The intention to alter the basic investment policy of the Trust was announced to the shareholders in a masterful bit of understatement. Since they held only a minority of the voting shares the debenture holders could not have prevented the change of policy, but they would have been forewarned of the coming move and might have resisted it by recourse to the courts.

Not one ray of light as to the defendants' intentions was revealed to the debenture holders. Even the name of the Eastern Racing Association was not allowed to be entered in the trustees' minutes. The plea of the defendants is that disclosure would have injured the chances of completing the transaction. However this may be, these defendants were dealing, not with their own money, but with the money of the debenture holders; and entries into the minutes are not public information but are available to the security holders, the one group these defendants wished to keep in ignorance.

The entire attitude of the defendants toward their fiduciary relationship is further shown by their refusal to give any information on actual inquiry on behalf of the debenture holders. The reply sent by the Trust to Quincy Cass was as misleading as a communication could be without descending to falsehood. Even after the track had been bought the defendants were not ready to reveal to the owners of debentures the details of the purchase. If the information could be held until the publication of the June 30 report, the racing meet would be virtually completed. Here again there was fundamental conflict of interest. The debenture holders were entitled to full disclosure, fairly presented; but such disclosure would endanger the defendants' chances for personal gain.

Other considerations have been enumerated by Congress in the light of which the conduct of the defendants should be examined. The public interest and the interest of investors are adversely affected when investment companies change the character of their business without the consent of their security holders. The purchase of the control of Suffolk Downs took the Trust from concentration in utilities into concentration in horse racing, not merely for investment but for control. The change was approved by the majority of the voting shares held by Hanlon, but not by the owners of the only equity interest in the Trust.

In enacting the Investment Company Act of 1940 it is evident that Congress was concerned with the very conditions that exist in this case. This Court is not prepared to render innocuous the operation of this legislation by declaring that the activities engaged in by those defendants are not within the scope of those condemned by Congress.

## Conclusions of Law

In the light of the foregoing:

(1) I find and rule that Gordon B. Hanlon, as president of the Aldred Investment Trust and, during 1943, as a trustee of the Aldred Investment Trust and continuing as such until January 17, 1944, has been guilty of a "gross abuse of trust" within the meaning of Section 36 of the Investment Company Act of 1940.

(2) I find and rule that Robert P. Loring, Elton N. Hanlon, W. Edward Higbee and Malcolm M. Bowen, who were all trustees prior to January 17, 1944, were guilty of "gross abuses of trust" within the meaning of Section 36 of the Investment Company Act of 1940. The abuses for the most part were of a negative nature, in that they failed to either protest against Hanlon's activities or failed in their duties to the debenture holders to make such disclosures as they should have made under the circumstances.

(3) I find and rule that the defendant Arnold, of the group of defendants, was most closely associated with Gordon Hanlon. Although not a trustee he was designated by Hanlon to be the treasurer and vice president of the Trust and, through the trustees' control of Suffolk Downs, he was placed by Hanlon in the position of treasurer of the Racing Association. He was completely dominated by Hanlon to an extent that warrants a finding that he was guilty of a "gross abuse of trust".

(4) I find and rule that the evidence is insufficient to warrant a finding of "gross abuse of trust" on the part of Hart since he did not become a trustee until January 17, 1944, and this was at a time when the acquisition of Suffolk Downs had been virtually completed.

(5) The plaintiff's prayer for an injunction against these defendants is granted as to the defendants Gordon B. Hanlon, Robert P. Loring, Elton N. Hanlon, W. Edward Higbee, John L. Arnold, and Malcolm N. Bowen. Each of the aforesaid defendants is hereby enjoined from serving or acting in the capacity of trustee or as an officer of the defendant Aldred Investment Trust.

(6) The plaintiff's prayer for the appointment of a receiver is granted and such receiver will be appointed with the power either to reorganize the capital structure of the Trust or liquidate the Trust and distribute the assets to such creditors, debenture holders, and shareholders of the Trust as may be entitled thereto.

(7) A judgment in accordance with these findings and rulings may be submitted forthwith.

Civil Action No. 2708:

In view of the fact that the relief prayed for in this, the Stratton case, has been fully granted in the S.E.C. case, it seems unnecessary to pass upon the merits of the Stratton case. The bill is therefore ordered dismissed without prejudice and without costs.