ALDRED INV. TRUST et al. v. SECURITIES AND EXCHANGE COMMISSION.
No. 4084.

Circuit Court of Appeals, First Circuit.
Sept. 17, 1945.

Writ of Certiorari Denied Jan. 28, 1946.
See 66 S.Ct. 486.

Before MAHONEY, Circuit Judge, and PETERS and FORD, District Judges.

Hugh D. McLellan, of Boston, Mass. (William J. Hession, of Boston, Mass., of counsel), for appellants.

Milton V. Freeman, Asst. Sol., S. E. C., of Philadelphia, Pa. (Roger S. Foster, Sol., S. E. C., of Philadelphia, Pa., Frank Kopelman, Atty., S. E. C., of Boston, Mass., Arnold R. Ginsburg, of Philadelphia, Pa., and E. Russell Kelly, of Baltimore, Md., of counsel), for appellee.

Joseph N. Welch and Robert A. B. Cook, both of Boston, Mass., for Charles F. Stratton, amicus curiae.

J. Campbell Palmer, III, of Charleston, W. Va., and George B. Rowlings, of Boston, Mass., for special receivers of Fidelity Assur. Ass'n, amici curiae.

MAHONEY, Circuit Judge.

The Securities and Exchange Commission, hereinafter called S.E.C., brought this action to enjoin the officers and trustees of Aldred Investment Trust from continuing to act in such capacities and for the appointment of receivers. The District Court held that all but one of the individual defendants [1] had been guilty of "gross abuse of trust" as officers and trustees of the trust within the meaning of § 36 of the Investment Company Act of 1940, 54 Stat. 841, 15 U.S.C.A. § 80a—35. 58 F. Supp. 724. From the entry of its decree enjoining them as individuals from continuing to serve as officers and trustees and appointing receivers with power either to reorganize the capital structure or to liquidate the trust, Gordon B. Hanlon, Robert P. Loring, Elton N. Hanlon, W. Edward Higbee, John L. Arnold, Malcolm M. Bowen and Aldred Investment Trust have appealed. [2]

§ 36 of the Investment Company Act provides:

"The Commission is authorized to bring an action in the proper district court * * * alleging that a person serving or acting in one or more of the following capacities has been guilty * * * of gross misconduct or gross abuse of trust in respect of any registered investment company for which such person so serves or acts:

"(1) as officer, director, member of an advisory board, investment adviser, or depositor; or

"(2) * * *

If the Commission's allegations of such gross misconduct or gross abuse of trust are established, the court shall enjoin such person from acting in such capacity or capacities either permanently or for such period of time as it in its discretion shall deem appropriate."

Aldred Investment Trust was organized in 1927 as a common law trust under the laws of Massachusetts. Aldred & Company, investment bankers, of New York, were the sponsors. The trust indenture provides for five trustees and vests in the organizing trustees and their successors absolute control. They receive legal title to the trust estate and complete management and investment discretion. In the case of vacancies the remaining trustees are empowered to appoint successor trustees. A majority of the trustees or the holders of 25% of the common voting shares, however, may at any time call a shareholders' meeting at which the trustees may be superseded or reelected and vacancies filled by vote of the holders of a majority of the shares. While the shareholders have no power to put an end to the trust before the end of seventy-five years from the formal date of the trust agreement or twenty-one years after the expiration of specified lives in being, the trustees in their discretion may terminate the trust

---

[1] As to Ezra D. Hart, the court below found no abuse of trust since he did not become a trustee until January 17, 1944, at which time the purchase of control of Suffolk Downs was virtually completed.

[2] In a companion proceeding brought by Charles F. Stratton, a holder of Aldred Trust debentures, on behalf of himself and the other security holders, seeking the appointment of receivers and the liquidation of the Trust, the court below found it unnecessary to pass on the merits of the case since the relief sought was fully granted in the S.E.C. proceeding and dismissed the bill without prejudice. All the evidence in the Stratton case, which was tried first, was incorporated by reference in the instant case.

earlier by their unanimous action. The indenture further provides that no investment shall be deemed improper because of its speculative character, or because a greater proportion of the trust estate is invested therein than is usual for trustees, or because the officers or trustees may have an interest therein or stand to profit from such investment.[3]

The Trust has outstanding in the hands of the public debentures maturing in 1967 in the amount of $5,900,000, and bearing interest at the rate of 4½%. For each $100 of principal one common share of no par value was attached to each debenture so that there are outstanding 59,000 non-detachable common shares. The Trust also issued 112,500 free common shares not attached to any debentures to Aldred & Company, sponsors of the Trust. Upon default in the payment of interest the debentures provide for acceleration of the due date of the principal at the written request of the holders of 25% in amount of the debentures.

From the date of its organization through 1943 the trust portfolio was made up largely of securities of public utility and industrial companies. Since 1937 the market value of the trust assets has been substantially less than the principal amount of the debentures outstanding, the asset value of each $1000 debenture going from $712.00 in 1937 to a low of $362.66 in 1941, to $559.98 in 1943, and to $643.86 on June 30, 1944. From 1940 through 1943 the Trust could not meet its interest requirements out of income, and some $479,000 of approximately $1,060,000 paid out as interest during those years was derived from the sale of trust principal.

The Trust is registered with the S.E.C. pursuant to § 8 of the Investment Company Act, 15 U.S.C.A. § 80a—8, as a close-end, non-diversified management investment company, 15 U.S.C. § 80a—5(a) and (b). In its registration statement filed with the Commission, the Trust said that it was not its policy "to make investments in companies for the purpose of exercising control or management"; that it had no policy limiting the "proportion of the voting securities of any one company which it may acquire, even though presumptive or actual control might result from such acquisition"; that although its investments were concentrated in securities of public utility corporations its policy was "to effect a greater diversification of its investments among different industries"; and that it did not "intend to make investments in any other industry [than utilities] if immediately thereafter its investment in such industry would exceed in value 25% of the value of its total assets."

---

[3] "No investment or reinvestment shall be deemed improper because of its speculative character or because a greater proportion of the Trust Estate is invested therein than is usual for trustees, or by reason of any interest, direct or indirect, which any Trustee or any Shareholder or any officer of the Trust, or any of them, either individually or in any representative or fiduciary capacity, may have therein, or by reason of any profit that they or any of them may make therefrom, it being the intent that in investing and reinvesting the funds of the Trust the Trustees and officers shall have the utmost freedom in the choice of securities and investments and that there shall be no limitation upon such absolute discretion, and also that it shall not be improper for the Trustees and officers to buy from and sell to or otherwise deal with any firm, corporation or other organization of which any one or more of the Trustees or officers of the Trust may be a member or in which he or they may be financially interested, even though such dealings may result in profits to such firm, corporation or organization, nor shall the personal interest of any Trustee or officer affect the validity of any such dealings or disqualify such Trustee or officer from voting on or participating in any such transaction, nor shall his participation in any such transaction in which he may have a personal interest render him liable to account for any profits or make good any losses, either to the Trust or to any Shareholder. In particular, it is contemplated that members of the firm of Aldred & Company shall be associated with the management and control of this Trust as Trustees and/or officers, and it is agreed that the Trustees may buy from, sell to and otherwise deal with said firm and with corporations and other organizations in which said firm or any of the members thereof are financially interested, and that members of said firm as Trustees and/or officers of this Trust may vote upon and act for this Trust in connection with its dealings with said firm and with such corporations and other organizations without any impropriety or disqualification and without rendering themselves liable to this Trust or to any Shareholder in connection with any profits which may accrue to them or any losses which may be incurred by this Trust or in any manner whatsoever."

In October, 1941, Gordon B. Hanlon, securities broker and appellant herein, purchased 110,000 shares of the Trust at a public auction conducted on behalf of the Chase National Bank of New York as foreclosing pledgee. The price paid was approximately $10,000 plus some $9,000 in transfer taxes. At the time of the sale the trust assets had a market value of about $2,110,000 outstanding against which were the $5,900,000 in debentures. At a special meeting of the shareholders called at the request of Hanlon on November 18, 1941, the trustees were superseded and Hanlon and his nominees, Virginia C. Spaulding, and the appellants, Elton N. Hanlon, Robert P. Loring, and Malcolm M. Bowen, were elected as trustees. Two days later on November 20, another special meeting was held and the trustees elected the appellant Gordon B. Hanlon, president, the appellant Arnold, treasurer, and the appellant Loring, secretary. Virginia C. Spaulding resigned as a trustee and James M. Haynes was elected in her place. He served until February, 1943, when he resigned and the appellant Higbee was elected to fill the vacancy. The only other change in the trustees was Gordon B. Hanlon's resignation in January, 1944, as a trustee but not as president. Hart was named a trustee at that time.

After careful consideration of the evidence presented at the trial the District Court made detailed findings with respect to the management of the Trust by the appellants and concluded that their conduct had been calculated to further their personal advantage and that they were motivated primarily by personal interest and had conducted the Trust contrary to the interest of the debenture holders, which conduct constituted gross abuse of trust.

In the view we take of the case two questions are presented: (1) Does the evidence support the finding of the court below that the officers and trustees of the Trust, with the exception of Hart, have been guilty of gross abuse of trust within the meaning of § 36 of the Investment Company Act; and (2) could the court properly appoint receivers?

The appellants challenge none of the facts upon which the decision below rested. Their objections extend only to the inferences drawn from the admitted facts to which they join the assertion that the District Court omitted consideration of certain other relevant facts which it should have taken into account. We have examined the record carefully, and in our opinion the only inferences permissible from the evidence and testimony presented at the trial are clearly to the effect that Hanlon and his associates during the period they had the management of the Trust were motivated primarily by ideas of personal gain. From the moment they took over they embarked upon a course of action which culminated in the acquisition of Eastern Racing Association. That transaction enabled Hanlon and his associates to elect themselves directors and officers of the Suffolk Downs horse-racing track, a business about which they knew nothing but which carried the certain prospect of handsome salaries.

The other appellants are all relatives, employees or close personal friends of Hanlon. Elton N. Hanlon is his brother; Loring is an employee; Higbee is a research chemist and a personal friend; Bowen is a personal friend; Hart, who is only concerned with this appeal in his capacity as trustee, is a former employee; Arnold, who is not a trustee, worked very closely with Hanlon as treasurer and was destined to receive one of the two large salaries to be paid the appellants by Eastern Racing Association. We are not disposed to question the conclusion of the District Court that "at all times the trustees have been subject to Hanlon's wishes and directions." It is apparent from the record that Hanlon's was the guiding hand and that the other appellants readily fell in with all his plans for the management of the Trust.

At the time Hanlon purchased control of the Trust the market value of the trust assets was approximately one-third the face amount of the debentures outstanding, and the earnings of the Trust were not enough to meet its interest requirements. As the District Court said, Hanlon's shares which represented no asset value did constitute voting control "with the attendant power to elect and remove trustees and officers, to fix the compensation of the latter, and to dominate completely the policies of the Trust"; their real value "lay in their control of the Trust's policy, the Trust's assets, and the ability to direct the overhead management costs." It is with the purposes for which that power was used that we are here concerned.

In 1942 Hanlon received a salary of $5500 as president, and this was raised to $6900 the following year, which the court found was a salary in excess of those paid by the Trust in previous years. Immediately after acquiring control, Hanlon moved the trust offices to his place of business in Boston, and for office space hitherto used by Hanlon & Company plus one additional room at a rental of $40 a month, and facilities, the Trust was charged $410 a month. Pursuant to the terms of the indenture the trustees each received $1200 a year. The appellant Loring was an office employee of Hanlon's at $40–$45 a week. Upon his election as trustee and secretary he received a cut in salary from Hanlon of $10 a week.

The appellants contend that at all times they were acting in the interest of the debenture holders. Their protestations of good faith are not borne out in the record of what they did. In January, 1942, Hanlon approached the S.E.C. to get its views on a possible reorganization. He told the Commission that since the trust income was insufficient to meet its interest charges the Trust faced two alternatives, liquidation or reorganization. The former Hanlon opposed on the ground that the trust portfolio consisted largely of securities in certain excellent utilities which were yielding a very satisfactory return but which were underpriced in the market and could not be liquidated at fair values under existing conditions. He submitted a proposed plan of reorganization and later two amendments which the Commission rejected as "grossly unfair" and threatened injunction proceedings under § 25(c) of the Investment Company Act, 15 U.S.C.A. § 80a—25(c), if they were acted upon by the Trust. The plan contemplated the replacement of the 4½% fixed interest debentures with 4½% income debentures, interest to be payable only if earned, and no change in the control and management of the Trust. The first amendment offered the debenture holders the right to elect three of the trustees, and the second proposed the sterilization of 85,000 of the 110,000 shares held by Hanlon. Throughout these negotiations the Commission took the position that in view of the circumstances "any plan of reorganization which did not recognize the debenture holders' virtually exclusive interest in the Trust and the absence of any equity interest therein in Hanlon and the shareholders was grossly unfair." Although

Hanlon had taken the position that the Trust was faced with the alternatives of liquidation or reorganization neither step was taken. The District Court recited these negotiations as evidentiary of the conflict of interest between the appellants' concern with the perquisites of control and a proper concern for the interest of the debenture holders which dictated either reorganization or liquidation. As the court pointedly remarked: "Hanlon, since he had no equity standing in the enterprise, could not gain by liquidating, and stood to lose the more than $10,000 per annum he was receiving from the Trust." The awareness of this conflict of interest is further suggested by the action of the trustees in December, 1942, when they voted to pay salaries in advance instead of paying them a week after they were due. Hanlon testified that this step was taken in consequence of a threat of bankruptcy proceedings made by certain representatives of the debenture holders in connection with their demand for three seats out of the five trustees, the opinion having been expressed to counsel for Hanlon that the payment of salaries constituted an illegal preference under bankruptcy law. Moreover, throughout 1942 and 1943 the Trust engaged in selling securities to meet its running expenses and interest charges. The court considered this to be a return of capital in the guise of interest. It pointed out that no technical act of default could occur so long as the appellants could sell securities and pay out the proceeds as "ostensible interest"; that this left the debenture holders "helpless under the terms of the debenture instrument to halt the dissipation of their assets", and concluded that so long as the "personal advantage" of the appellants stood in the way "the debenture holders could not expect relief either by way of bona fide recapitalization or liquidation."

In December, 1943, Hanlon began negotiating for the purchase of a controlling interest in Eastern Racing Association which operated Suffolk Downs horse-racing track. In January, 1943, the Trust accepted an option to buy 14,471 shares or 50.3 per cent of the voting securities of Eastern Racing Association at $80 a share. The option was taken up and the transaction completed by the end of February. It involved an investment of in excess of $1,150,000, approximately 30% of the trust assets, and put the Trust in the horse-racing business and enabled the trustees to

take over operating control of Suffolk Downs. During the time these negotiations were going on the market price of the stock ranged from $52 to $59 for small blocks of shares. It is clear that the sale price of $80 a share represented a premium for control. To raise the necessary cash the Trust had to liquidate 30% of its portfolio, and among the securities sold were those Hanlon had told the S.E.C. should not be sold hastily or in large blocks. Further, it appears that some of the trust securities were sold at prices under the market.

The appellants promptly elected themselves directors of Eastern Racing Association and Hanlon was made president, Arnold treasurer, and Loring vice-president. At the time of the purchase the appellants knew that Charles Francis Adams and Bruce Wetmore as president and treasurer of the Association had each been receiving salaries of $25,000 per year and bonuses of an additional $25,000 per year. They agreed to stay on in the capacities of "Director of Racing" and "General Manager and Controller" respectively at salaries of $20,800 a year each. In requesting the approval of the Wage Stabilization Board of these new executive positions Hanlon represented to the Board that the salaries of the new president and treasurer would be so limited that the total salaries paid by the Association would not exceed the $100,000 per annum received previously by Adams and Wetmore. The Board concurred in the creation of the two new positions but stipulated that the salaries of president and treasurer should not exceed $25,000 each. Hanlon thereupon sought to have this limitation lifted. From the testimony it appears that Hanlon first testified that he had discussed the salary to be paid him with no one. The other appellants also testified to the fact that no consideration of possible salaries influenced them. With respect to the negotiations with the Wage Stabilization Board, Hanlon denied that he talked to their representatives about any salary he might receive at the same time that he admitted discussion with respect to the proposed limitation upon the salary of president, the position he himself occupied at that time. It is apparent from the face of the record that Hanlon's testimony with respect to salaries was equivocal and evasive.

As the investment of 30% of its assets involved an abrupt departure from the Trust's declared investment policy to seek increased diversification and not to invest in a company for the purpose of exercising control and management it was necessary to amend the policy statement on file with the S.E.C. This required the approval of a majority of the shareholders. Therefore the Trust called a meeting of the shareholders for January 24, 1944. The only hint given in advance that a change in trust policy was contemplated was the equivocal statement in the postcard calling the meeting that it was "To consider and vote upon future investment policy for the Trust"—labeled "a masterful bit of understatement" by the court below. In its opinion, the appellants were pursuing "a positive plan of concealment" designed to prevent the debenture holders from objecting to a basic change in investment policy and intended to present them with a *fait accompli,* thereby preventing them from taking recourse to the courts. In the Annual Report for 1943 signed by Hanlon on January 20, 1944, just four days before the shareholders' meeting, he told the shareholders that the trustees "have given careful thought and have established well considered policies which they feel should meet whatever new conditions the future months may bring forth." On January 15 a Boston broker wrote for information on behalf of debenture holders who were concerned over rumors that the Trust had radically changed its portfolio, and on January 18 the appellant Arnold replied that "we are unable to imagine" whence came such rumors and referred to the Annual Report about to be sent out as showing only changes "which occurred in the normal course of portfolio management"— characterized by the court below "as misleading as a communication could be without descending to falsehood." The shareholders met on January 24 and voted the change in trust policy. At that meeting 100 shares apart from Hanlon's were represented. Nothing was said of any intention to purchase a race-track. Immediately after the close of that meeting, however, the trustees met and Hanlon revealed that an option to purchase Suffolk Downs had been offered. That night at a second meeting Hanlon was authorized to sign the option. Even in March after the transaction had been completed the trustees were following a policy of evasion and equivocation with the debenture holders. On March 25 the treasurer refused to reveal how many shares of Eastern Racing As-

sociation had been acquired and referred a broker seeking that information to the June 30 semi-annual statement. By that date, as the District Court points out, "the racing meet would be virtually completed".

■ An investment company is essentially a liquid aggregation of capital consisting of public savings turned over to the company for investment in productive enterprise. It normally invests for the yield as distinguished from the control of productive enterprise, and along such lines it is to be distinguished from the holding company. The shareholder has two inducements to invest in investment company securities: (1) Thereby he can obtain a diversification of investment not otherwise available; and (2) thereby he may expect to obtain a more expert management of his savings than he could otherwise command. By reason of its essential character of liquidity the investment company is peculiarly subject to abuse (See Report of the Securities and Exchange Commission on Investment Trusts and Investment Companies (1939); 50 Y.L.J. 440; 41 Col.L.R. 269). The Investment Company Act of 1940 meets the problems recognized therein by subjecting investment companies to regulation by the S.E.C. § 1(b) of the Act, 15 U.S.C.A. § 80a—1 (b), in effect codifies the fiduciary obligations placed upon officers and directors of investment companies. It declares the national public interest and the interest of investors to be adversely affected—

"(1) when investors * * * vote, refrain from voting, * * * without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their management;

"(2) when investment companies are * * * operated, managed, or their portfolio securities are selected, in the interest of directors, officers * * * rather than in the interest of all classes of such companies' security holders;

"(3) when investment companies * * fail to protect the preferences and privileges of the holders of their outstanding securities;

"(4) * * *

"(5) when investment companies, in keeping their accounts, in maintaining reserves, and in computing their earnings and the asset value of their outstanding securities, employ unsound or misleading methods, or are not subjected to adequate independent scrutiny;

"(6) when investment companies * * change the character of their business * * * without the consent of their security holders;

"(7) * * *

"(8) when investment companies operate without adequate assets or reserves."

The findings of the District Court, amply supported by the evidence, reveal a course of conduct that was motivated by self-interest and personal advantage and the calculated denial of fiduciary obligations. At no time during the period the appellants managed the trust did the shares they relied on for control represent any equity position. The trust assets belonged to the debenture holders. In effect the appellants have been using their control of other people's money to enrich themselves through the perquisites of such control. In our opinion the court below properly found them guilty of "gross abuse of trust" within the meaning of § 36 of the Act. As the Supreme Court said in Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L. Ed. 281:

"He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. * * * He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation."

■ With respect to the appointment of receivers, the appellants contend that Hanlon, as the owner of voting control, has the power, "with which no one has any right to interfere," to supersede the enjoined trustees and elect new trustees; and that, conceding the propriety of receivership, the commission under the statute has no authority to ask for such relief.

We do not agree with either of these contentions. Hanlon's voting control represents no equity interest in the Trust, and to permit him to remain in control

would be to perpetuate the very conditions that brought about this suit. In granting relief the District Court relied upon its equity power to appoint receivers with power either to reorganize or liquidate the Trust. In the light of the circumstances surrounding this case the only effective means of protecting the interests of the debenture holders was to remove Hanlon from the control of the trust assets which do not belong to him. Section 36 invokes the equity power of the Federal Court and that calls into play its inherent powers where necessary to do justice and grant full relief. The appointment of receivers in the case at bar was an appropriate exercise of the court's inherent equity power. Graham v. Railroad Co., 102 U.S. 148, 161, 26 L.Ed. 106; Ketchum v. MacDonald, 3 Cir., 1936, 85 F. 2d 436 certiorari denied 299 U.S. 595, 57 S.Ct. 120, 81 L.Ed. 438; Tower Hill-Connellsvilie Coke Co. v. Piedmont Coal Co., 4 Cir., 1933, 64 F.2d 817, 823, 91 A.L.R. 648; S.E.C. v. Fiscal Fund, D.C., 1943, 48 F.Supp. 712. S. E. C. v. Long Island Lighting Co., 2 Cir., 1945, 148 F.2d 252 relied on by the appellants, turned on a question of jurisdiction of the subject matter which question is not present in the instant case.

The judgment of the District Court is affirmed.

PETERS, J. (concurring). I concur in the conclusion of the other members of the court that the judgment of the District Court should be affirmed; but I do not think it is necessary to go further than to say that, granting the terms of the trust instrument were sufficiently broad in wording to authorize the purchase of the control of a race track, an investment of such a character by trustees is so unusual and, in this case, so foreign to the established policy of the management of the trust that it requires a clear showing of the highest degree of good faith and wholly disinterested motives on their part to justify it. It has been said that "The broader the latitude of the discretion given to the trustee, the greater is the duty of good faith required in the exercise thereof." Mayfield v. First Nat. Bank of Chattanooga, 6 Cir., 137 F.2d 1013, 1019. The District Judge, who saw and heard the witnesses, reached the conclusion and found as a matter of fact that, in making their purchase, the trustees were motivated by self interest. Even if motivated only in part by self interest the result would be the same, in my opinion, and certainly to that extent the finding cannot be called clearly erroneous or unreasonable.

In view of the declaration of policy set forth in the Act in question it appears that the term "gross abuse of trust", as used therein, covers a course of conduct by the officers and controlling stockholders of an investment company in violation of the standards of conduct generally applied to fiduciaries, such as would exist if they were acting with other than disinterested motives.