**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**TALLEY INDUSTRIES, INC., American Investors Fund, Inc., Chestnutt Corporation, and General Time Corporation, Defendants-Appellees.**

No. 573, Docket 32506.

United States Court of Appeals Second Circuit.

Argued July 22, 1968.

Decided July 31, 1968.
Certiorari Denied Jan. 13, 1969.
See 89 S.Ct. 615.

# 398

John A. Dudley, Special Counsel (Philip A. Loomis, Jr., General Counsel, David Ferber, Solicitor, Anthony A. Vertuno, Janet G. Gamer, Attys., Securities and Exchange Commission, Washington, D. C., Mahlon M. Frankhauser, Regional Administrator, Richard V. Bandler, Associate Regional Administrator, Edwin H. Nordlinger, Attorney, New York City, of counsel), for Securities and Exchange Commission.

Clendon H. Lee, New York City, (O'Connor & Farber, New York City, of Counsel), for defendants-appellees American Investors Fund, Inc. and Chestnutt Corporation.

P. G. Pennoyer, Jr., New York City, (Chadbourne, Parke, Whiteside & Wolff, New York City, Lawrence Kill, John G. Collins, New York City, Jerold Oshinsky and Irene C. Warshauer, New York City, of counsel), for appellee General Time Corporation.

Walter L. Stratton, New York City, (Donovan, Leisure, Newton & Irvine, New York City, Breck McAllister, Roy W. McDonald, Roger W. Kapp, Robert S. Ogden, Jr. and Ben Vinar, New York City, of counsel), for appellee Talley Industries, Inc.

Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

For the second time this term, see SEC v. Sterling Precision Corporation, 2 Cir., 393 F.2d 214, we are confronted with a close question of interpretation of § 17 of the Investment Company Act of 1940, 54 Stat. 815, setting limits on "Transactions of Certain Affiliated Persons and Underwriters." On this occasion we believe the district judge construed the relevant clause, § 17(d), too narrowly, reverse his judgment dismissing the complaint, and direct further appropriate proceedings.

## I.

Section 17(d), so far as here relevant, provides as follows:

(d) It shall be unlawful for any affiliated person of or principle underwriter for a registered investment company (other than a company of the character described in section 80a–12 (d) (3) (A) and (B) of this title), or any affiliated person of such a person or principal underwriter, acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant.

Defendant Talley Industries, Inc. (hereafter Industries) is an "affiliated person" of defendant American Investors Fund, Inc. (hereafter Fund), a registered investment company, by virtue of Fund's owning 9% of Industries' voting shares, see § 2(a) (3) (B). As a result of discussions between Franz G. Talley, president of Industries, a company having a net worth of some $10 million, and Michael Kimelman, a partner in the brokerage firm of M. Kimelman & Co., in which Kimelman advanced General Time Corporation, a much larger corporation, as a candidate for acquisition by a merger with Industries, Talley gave Kimelman an order under which he bought 24,800 shares of General Time for Industries on December 26 and 27, 1967; the price was around $23 or $24

per share. This was only some 1% of the outstanding stock of General Time, a long way from what Talley thought would be needed to afford a prospect of success if he should decide to go forward with an acquisition or merger proposal.

On December 29, 1967, Talley telephoned Fund's office, and ultimately spoke to George A. Chestnutt, Jr., president of Fund and of Chestnutt Corporation, its investment adviser. Talley told him that Industries had bought stock in a certain company which he viewed as a possible merger candidate and that he had in mind that Fund also might wish to buy some stock. Chestnutt broke off the conversation to consult his counsel. The latter advised that Fund could follow Talley's suggestion so long as it "maintained complete independence in our acquisition of stock and didn't make any promises or arrangements" as to voting, disposition or otherwise. Chestnutt relayed this to Talley, who accepted Fund's proceeding in this manner. Talley then named the company, saying he thought it a good investment that might become better under a more aggressive management. He indicated that Industries intended to buy more General Time stock in the market, with an eye toward a merger; Chestnutt got the impression that Talley was thinking of terms that would yield around $45 in Industries securities for each share of General Time. Talley proposed that Kimelman get in touch with Chestnutt; the latter, after telling Talley that 10% of the General Time stock would be his legal limit, said he would study his own data on the company, would like to see Kimelman, and would think the whole thing over. Shortly thereafter Industries bought 42,000 shares of General Time.

Kimelman visited Chestnutt on January 3. Next day Chestnutt determined that Fund should take a position in General Time. He was motivated both by study of the company's earnings and by a belief that if Industries sought a merger, the stock would rise as a result of that offer or of others it might stimulate. On January 5 Fund placed an order with Kimelman for 205,000 shares, subsequently increased to 210,000, just under Fund's 10% limit, on a "not-held" basis, i. e., with the time of execution at the broker's discretion. Chestnutt reported this to Talley.

Chestnutt maintained close supervision of Kimelman's purchases, insisting that on days when Kimmelman had "not held" orders from other customers, shares should be allocated so as not to favor another customer over Fund. Industries was also making some purchases of General Time through Kimelman but at least on one occasion agreed to forego allocation and accept the most expensive shares. By February 15 Fund had acquired 210,000 shares at an average cost of $28.49 per share.

During the first week of January 1968, Talley discussed the situation, including his initial conversation with Chestnutt, with his counsel, who did not mention § 17(d). After some backing and filling unnecessary to recount, Industries resumed purchases of General Time toward the end of January. Talley talked to Chestnutt four or five times during January and reported how many shares he thought "were being acquired by the Kimelmans and himself and his friends and so on." He would give Chestnutt percentage figures of what "we have" and these rather obviously included the holdings of Fund. On February 5 Industries sold 40,000 shares to Donald Harrington, a friend of Talley's, who later increased his holdings to 104,500 shares. Finding that the record date for General Time's annual meeting was March 1, somewhat earlier than he had believed, and that Industries' own holding were only some 52,000 shares, about 2½% of the stock as against the 10% he considered necessary for a meaningful merger proposal, Talley made a special bid on the advice of his investment bankers, Smith, Barney & Co., and against that of Chestnutt who thought this would drive the price up and would not get Industries the amount of stock it wanted. The bid, on February 19, 1968, was for 200,000 shares at 36½.

General Time denounced this as "grossly inadequate" and said it had a higher offer, on a tax-free basis, from another company. Only 66,437 shares were acquired.

On the afternoon of February 19, a meeting was held at Smith, Barney & Co. at the instance of the management of General Time. Talley proposed a merger and said "We and our associates own about a third of the stock"—a figure which included Fund's holdings. Later that evening the management sent word to Talley it had decided to fight. Industries, which then owned 118,537 shares, about 5½% of the total, went back into the market and quickly bought another 139,400 shares at prices ranging from 41½ to 43½. This brought its holdings to 257,937 shares, about 12½%, at an average cost of $36.76 per share.

General Time's response was an action in the District Court for the Southern District of New York alleging *inter alia* a violation of 17(d) of the Investment Company Act and seeking an injunction against the voting of the stock, the obtaining of more, or any merger. Judge Bryan dismissed the action for lack of standing; General Time appealed. Meanwhile Industries selected ten nominees of an "Independent Stockholders Committee" for election as directors at the annual meeting of General Time on April 22, obtained a stockholders list only after litigation in Delaware, and sought to clear its proxy material with the SEC. On March 25 the SEC staff advised that the material would not be cleared unless Industries filed an application for approval of the acquisition of General Time stock by Fund and Industries under Rule 17d–1, which we reproduce in relevant part in the margin.[1] Industries filed such an application, with appropriate disclaimers of the need for doing so; a hearing was set for April 16; and the proxy material was cleared.

General Time then started a new action in the District Court for the Southern District of New York, claiming the proxy

[1]. Rule 17d–1. Applications Regarding Joint Enterprises or Arrangements and Certain Profit-Sharing Plans.

(a) No affiliated person of or principal underwriter for any registered investment company (other than a company of the character described in Section 12(d) (3) (A) and (B) of the Act) and no affiliated person of such a person or principal underwriter, acting as principal, shall participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company, or a company controlled by such registered company, is a participant, and which is entered into, adopted or modified subsequent to the effective date of this rule, unless an application regarding such joint enterprise, arrangement or profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan or modification to security holders for approval, or prior to such adoption or modification if not so submitted, except that the provisions of this rule shall not preclude any affiliated person from acting as manager of any underwriting syndicate or other group in which such registered or controlled company is a participant and receiving compensation therefor.

(b) In passing upon such application, the Commission will consider whether the participation of such registered or controlled company in such joint enterprise, joint arrangement or profit-sharing plan on the basis proposed is consistent with the provisions, policies and purposes of the Act and the extent to which such participation is on a basis different from or less advantageous than that of other participants.

(c) "Joint enterprise or other joint arrangement or profit-sharing plan" as used in this rule shall mean any written or oral plan, contract, authorization or arrangement, or any practice or understanding whereby a registered investment company or a controlled company thereof and any affiliated person of or a principal underwriter for such registered investment company, or any affiliated person of such a person or principal underwriter, have a joint or a joint and several participation or share in the profits of such enterprise or undertaking, but shall not include an investment advisory contract subject to Section 15 of the Act.

material was false and misleading in violation of § 14 of the Securities Exchange Act of 1934. Judge Tyler denied a preliminary injunction on April 11. On the next day Chestnutt was asked whether he would consider an offer for Fund's holdings in General Time from Del Coleman, president of Seeburg Corporation having its headquarters in Illinois. He countered by saying that he would be "down in front of the SEC testifying on the General Time situation next week, probably Tuesday" and might have to reveal anything that was said. Coleman first drew back but then asked whether Chestnutt would entertain a cash offer of $40 a share. Chestnutt replied that he would have to compare this with what anyone else might offer.[2]

April 13 saw the announcement of a plan to merge General Time and Seeburg Corporation, "contingent upon the continuation of General Time's present management." The details appeared on April 15. Chestnutt found the terms "shockingly unattractive"; he thought they would work out at not more than $28 per share of General Time as against a current market of $35. This, according to Chestnutt, was what made him decide to vote Fund's shares for the Committee's nominees and against the management.

The SEC hearings were held April 16, 17, and 18, oral argument was had before the Commission on April 19, and the Commission issued a Memorandum Opinion and Order that afternoon.[3] Concluding that Industries and Fund had

entered into and carried out a joint arrangement under § 17(d), that application for approval should have been made under Rule 17d–1, and that there was "no warrant for granting retroactive approval of the transactions effected in such violation," the Commission denied the application. It made no direction beyond an assertion in a footnote of its "continuing jurisdiction * * * over any future transfers by Industries of the GTC stock it has acquired. * * *"[4]

On April 22, after a further unsuccessful attempt by General Time to secure an injunction from Judge Tyler, the stockholders met, the ballots were cast, and the meeting was adjourned to May 3 so that the inspectors could count the votes and certify the result. Preliminary reports indicate a victory for Industries' slate, although by a margin considerably less than the shares voted by Fund.

On May 1, the SEC began this action in the District Court for the Southern District of New York. Asserting violation of § 17(d) and Rule 17d–1 by Industries and Fund, the complaint sought temporary and permanent relief enjoining further acquisition of General Time stock, requiring Industries and Fund to withdraw any votes cast at the stockholders' meeting, enjoining the voting of such shares for nominees proposed by Industries or for any merger with Industries, and enjoining future violations by Industries and Fund. The parties agreed that the court should order the trial to be advanced and consolidated with

2. Chestnutt also testified that a representative of Seeburg said, "You just name a price between 35 and 50 and we will talk business." Chestnutt named no price because he didn't feel "in a position to make such an offer without talking to counsel." Counsel advised that a sale at a premium might present a problem under Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2 Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L. Ed. 1277 (1955).

3. The opinion of the district judge states the facts as to an April 3 letter written to the Commission by the junior Senator from Illinois on stationery of the Senate Committee on Banking and Currency of

which he is a member, avowedly at the instance of General Time, "an important factor in the economy of Illinois and other States, as well as a producer of essential military and other items." While we do not suppose this letter had the slightest effect, it was unnecessary, to say the least. Senators and Representatives who are importuned by constituents to engage in such epistolary efforts might do well to keep at hand Senator George Norris' classic letter of declination, quoted in Landis, The Administrative Process, 101–04 (1938).

4. Industries has filed a petition in the 9th Circuit to review this order.

the hearing on the application for a preliminary injunction, see F.R.Civ.P. 65(a) (2). After trial Judge Wyatt delivered an opinion directing dismissal of the complaint, this appeal followed, and we have given it expedited treatment. Meanwhile the stockholders' meeting of General Time has been adjourned at first by stipulation and later by a stay issued by this court.

## II.

The first issue is whether the SEC may lawfully conclude that when an affiliated person and a registered investment company engage in a plan to achieve together a substantial stock position in another company, they can have effected "any transaction in which such registered company * * * is a joint or a joint and several participant" with the affiliate even though there is no legally binding agreement between them; we postpone the related issue whether if that proposition be affirmed, the facts here sufficiently disclose such a plan.

■ Little purpose would be achieved by tired-eye scrutiny of the word "transaction." This is not a technical term; "transact" means "To prosecute negotiations; to carry on business; to have dealings * * *." Webster's New International Dictionary (2d ed.) 2688. If any investment company and an affiliate agreed that each would buy 20% of the stock of a third company and would not sell without the other's consent, the case would evidently come within § 17(d), and it would be altogether immaterial whether "transaction" was read to refer to each purchase or the entire course of dealing or both. The real issue concerns the phrase "is a joint or a joint and several participant." [5]

■ ■ We begin by conceding that, on a quick reading, such black-letter words call up an image of situations where there is a considerable degree of common understanding. Industries argues, in a conspicuously able brief, that this conclusion is reinforced by § 12(a) (2) which forbids any registered investment company, in contravention of Commission rules, regulations or orders, "to participate on a joint or a joint and several basis in any trading account in securities * * *," this rather obviously contemplating a situation where definite legal obligations are fixed. Against this, however, § 17(d) must have been intended to reach situations not already covered by § 12(a). Furthermore any idea that § 17(d) is limited to the typical joint venture in which each of the parties has a fractional share is negated by the point that its very bite is to limit or prevent participation by the investment company "on a basis different from or less advantageous than that" of the affiliated person.

■ We find it hard to believe that a Congress which had declared "that the national public interest and the interest of investors are adversely affected * * * when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof * * * rather than in the interest of all classes of such companies' security holders," § 1(b) (2), meant "a joint or a joint and several participant" to be read in light of common law concepts of jointness. The need for a liberal construction in order to effectuate the statutory purpose would be clearer if, for example, Industries had been an affiliate because of its holding of 5% or more of the voting securities of Fund, § 2(a) (3) (A),

---

5. We thus find it unnecessary to discuss the issue, much debated by the parties, whether the SEC went beyond the statute when it added the words in Rule 17d-1(a), "in connection with, any joint enterprise or other joint arrangement or profit-sharing plan. * * *" In defining these terms subdivision (c) requires that the affiliate and the investment company "have a joint or a joint and several participation" or—not here contended— "share in the profits of such enterprise or undertaking." Hence, as to this case the critical question under the Rule is the same as under the statute.

rather than the reverse. Yet if "joint" embraces a loose kind of combination in cases of the former type where the case for a liberal construction is strong, as held by Judge Nordbye with respect to directors in SEC v. Midwest Technical Development Corp., CCH Fed.Sec.L. Reptr. ¶ 91,252 (D.Minn.1963), it must also do that here where the case is less so [6]—and this even though the strict letter of the statutory command is limited to the affiliate. Moreover, Congress could have thought that downstream affiliation also involved some danger that the investment company's stockholders might be put upon for the benefit of other stockholders of the affiliate.[7] "Joint" can mean not only "joined" or "united" but "combined." Webster's New International Dictionary (2d ed.) 1339. The case is thus appropriate for application of the settled principle that when administration of a statute has been confided to a regulatory agency and a statutory term is reasonably capable of the interpretation the agency has given, a court will sustain this even though it might have reached a different conclusion if the issue had arisen otherwise. Gray v. Powell, 314 U.S. 402, 411–413, 62 S.Ct. 326, 86 L.Ed. 301 (1941); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130–132, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); CIR v. Pepsi-Cola Niagara Bottling Corp., 399 F.2d 390 (2 Cir. 1968).

■ Even on that view, however, some element of "combination" is required. Industries forcefully contends this to be negated, particularly by Chestnutt's statement to Talley before Fund had even decided to make purchases of General Time. But here Industries encounters the Commission's decision to the contrary. Passing for the moment the question of the validity of the portion of Rule 17d–1 authorizing the hearing conducted by the SEC, we cannot subscribe to Industries' argument that in any event the administrative proceeding was "without legal significance," so that, as in SEC v. Frank, 388 F.2d 486, 491 (2 Cir. 1968), the Commission was cast in the district court in the same role as a private litigant as regards factual issues. To be sure the case is not here on a petition to review the SEC's order denying Industries' application for retrospective approval, and the provision of § 43 (a) making its findings conclusive if supported by substantial evidence thus is not applicable by its terms. But the principle underlying that rule—that a factual determination by an agency responsible for the execution of Congressional policy and vested with expertise shall not be disturbed by a court where there is substantial evidence to support it—applies none the less, and it would be little short of absurd for us to decline to follow the same standard by which a court reviewing the Commission's order would be bound. Cf. SEC v. Central-Illinois Securities Corp., 338 U.S. 96, 113–127, 69 S.Ct. 1377, 93 L.Ed. 1836 (1949).

■ Our summary of the facts shows there was substantial evidence here. While no one has cast doubt on the veracity of Chestnutt's testimony as to his initial conversation with Talley, this did not preclude the Commission's draw-

---

6. SEC v. Sterling Precision Corporation, supra, 2 Cir., 393 F.2d 214, does not support the view that the same language can be read one way in the case of upstream and another way in the case of downstream affiliation. We there declined to expand the word "purchase" in § 17(a) (2) to include a redemption by a downstream affiliate of its securities held by the investment company when a "sale" to the investment company of securities of the investment company held by an affiliate, whether downstream or up-

stream, admitted by the SEC to include a redemption, had been expressly excluded by Congress in § 17(a) (1).

7. We have noted the Commission's Proposal, Investment Company Act Release No. 5128, Oct. 13, 1967, to modify Rule 17d–1 "to provide more precise standards for the determination whether and when an application must be filed" and in that connection to narrow the cases where application must be made. See particularly proposed paragraph (e).

ing a contrary inference of intention from what the parties actually did. Indeed developments may well have brought Industries and Fund into a "combination" not clearly envisioned by either at the outset; war and the threat of war have always been powerful forgers of alliances. The Commission was justified in using its knowledge of the unspoken customs of the business world to conclude that, after Chestnutt had seen Industries spend over $8,300,000 in acquiring the 205,837 shares purchased in the special offer and on February 21 and 23, he was no longer a completely free agent as to the 210,000 shares Fund had purchased, on Talley's recommendation, for about 70% of that price. Experienced business men must have known at the outset that such a situation might arise. "An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." Republic Aviation v. NLRB, 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

### III.

█ The other serious issue of construction is whether, in seeking to implement § 17(d) by a general requirement of advance application and approval,

Rule 17d–1 exceeds the authority granted by Congress. Industries contends that the power conferred by § 17(d) was to prescribe *substantive* rules and regulations "for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant"; that the Commission has prescribed none but rather has unlawfully insisted on advance application and approval in every case; that the transaction thus must be deemed lawful since no valid rule or regulation prohibited it; or, at the very least, that it should be upheld because Industries did not acquire General Time stock "on a basis different from or less advantageous than that of" Fund. The issue must be considered in light of the general power conferred on the SEC by § 38(a) "to make, issue, amend, and rescind such rules and regulations and such orders as are necessary or appropriate to the exercise of the powers conferred upon the Commission elsewhere in this subchapter * * *." [8]

Here again, while initial reaction may favor Industries' contention, reflection sustains the Commission's view. The varieties in which participation by an investment company may be "different from or less advantageous than that" of an affiliate are infinite. The Commission could well have concluded that an attempt to specify these might fail to accomplish the Congressional purpose in some instances and in others accomplish more than Congress desired, and that the only effective method of regulation was to require advance disclosure and individual decision, at least until a pattern emerged, cf. note 7. Furthermore, as the Commission points out in brief,

---

8. Industries makes a point of the Commission's current effort to have Congress amend § 38(a) to conform its language to that, e. g., in § 20(a) of the Public Utility Holding Company Act, which empowers the SEC "to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate to carry out the provisions of this chapter * * *." See Report of the SEC on the Policy Implications of Investment Company Growth, 89th Cong.2d Sess., H.R.Rep. 2337, p. 343 (1966). We find it difficult to discern any truly significant difference; the Commission's purpose seems to have been to still arguments spawned by slight variations in the language of the acts it administers rather than to achieve power theretofore denied.

the public notice and opportunity for interested persons to come forward provided by the application procedure may lead to the development of significant facts that would not otherwise have been disclosed.

Industries mounts a counter-argument based on legislative history. It tells us that the Senate version of what became the Investment Company Act, S. 3580, 76th Cong.3d Sess. (1940), included as § 17(a) (4) a flat prohibition against affiliated persons' effecting transactions in which an investment company was a joint or a joint and several participant; relief would have been obtainable, as is now the case with respect to § 17(a) (1), (2) and (3), by application for an exemption under § 17(b). The change to the final version in which such transactions are condemned only insofar as they violate a particular standard, to be further specified in rules issued by the SEC, thus contra-indicates an intention that the Commission may require advance application and approval in all instances. While this is a possible inference, it is equally likely that Congress meant only that such transactions should be governed only by the standard limned in § 17(d) rather than the much more general ones of § 17(b). We thus do not find the legislative history so compelling as to warrant a conclusion that Congress meant to deny the SEC power to utilize a method of regulation it had successfully used in other areas.

### IV.

■ Our reversal of the judgment dismissing the complaint does not imply any belief on our part that the SEC is entitled to the drastic relief sought. Cf. SEC v. Midwest Technical Development Corp., supra, at p. 94, 154. This action is not one for enforcement of an order making such directions, where weight must be given to the agency's selection of remedy. It is a suit in equity, whose essence lies in "the power of the Chancellor to do equity and mould each decree to the necessities of the particular case."

Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).

■ The objective of § 17(d) of the Investment Company Act is to prevent affiliated persons from injuring the interests of stockholders of registered investment companies by causing the company to participate "on a basis different from or less advantageous than that of such other participant." On the face of things that has not happened here up to this time, and the objective for a court of equity must be to insure that it does not happen in the future. While we do not undertake to particularize the form of a decree, a prohibition against sale of its shares by Industries without according Fund a fair opportunity to participate would be one obvious device to that end. On the other hand, as at present advised, we fail to perceive how the interest of Fund's stockholders would be advanced by such provisions as requiring Industries and Fund to withdraw votes cast at the April 22 stockholders' meeting of General Time and enjoining further voting by them. Requirements of that sort would have a strong tendency to induce forced liquidation at least on the part of Industries, which surely did not make its large investment in order to be a voteless minority stockholder in General Time, and this might well be detrimental rather than advantageous to the stockholders of Fund. Whether or not General Time had sufficient standing to direct judicial attention to the violation of § 17(d), an issue on which we have no occasion to pass, protection of the interests of its management in retention in office is not an objective of that section. While an order going beyond what would otherwise be the necessities of the case may sometimes be justified as against a deliberate flouter of regulatory statutes, Industries and Fund cannot be so regarded. Section 17(d) had been rarely construed, the only reported cases cited to us in addition to SEC v. Midwest Technical Development Corp., supra, being one portion of a decision of the Commission under the Securities Exchange

Act, Imperial Financial Services, Inc., Securities Act Release No. 7684 at 8–10 (1965), and a portion of a very recent case dealing primarily with § 17(a), Fifth Ave. Coach Lines, Inc. Investment Company Act Release No. 5214, December 27, 1967. No decided case had ever applied § 17(d) to a situation like that here, and conscientious counsel could well have believed the reservations Chestnutt stated were sufficient to make it inapplicable.

The judgment dismissing the complaint is reversed, with directions to the District Court to proceed promptly to formulate an injunction consistent with this opinion. The stay of the reconvening of the annual meeting of General Time will remain in effect until such injunction is issued.