Rose BLOOM, Plaintiff,

v.

Harold K. BRADFORD et al.,
Defendants.

No. 75 C 1474.

United States District Court,
E. D. New York.

Nov. 8, 1979.

Bennett Frankel, P.C., New York City, for plaintiff.

Carter, Ledyard & Milburn, New York City, for defendants Harold K. Bradford, Clifford H. Anderson, John C. Cornelius, Lewis L. Crosby, Randall F. Fullmer, Frederick L. Hovde, Donald M. Kendall and Earl T. Winget, Jr.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant Stuart F. Silloway.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Investors Diversified Services, Inc.

Davis, Polk & Wardwell, New York City, for defendants Variable Payment Fund, Inc. and Investors Stock Fund, Inc.

Turk, Marsh, Kelly & Hoare, New York City, for nominal defendant Investors Mutual, Inc.

Patterson, Belknap, Webb, & Tyler, New York City, for defendant Fred M. Kirby, II.

The Securities and Exchange Commission, amicus curiae (William A. Dietch, Asst. Gen. Counsel, Washington, D. C.).

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

*Background*

Defendants move for summary judgment in this action brought by plaintiff on behalf of defendant Investors Mutual, Inc. ("Mutual"), an open-end investment company registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "Investment Company Act"), 15 U.S.C. § 80a–1, *et seq.*

The amended complaint also names as defendants Investors Diversified Services, Inc. ("IDS"), Investors Variable Payment Fund, Inc. ("Variable"), Investors Stock Fund, Inc. ("Stock Fund"), ten individuals who were directors of Mutual, almost all of whom were simultaneously directors of Variable or Stock Fund or both, and Fred

M. Kirby, II, the Chairman of IDS's Board of Directors. IDS, registered with the SEC as an investment adviser under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1, *et seq.*, acted as investment adviser for Mutual, Variable and Stock Fund during the period in question.

The amended complaint asserts four claims, all of which basically arise out of a series of purchases and sales of Penn Central Company ("Penn Central") stock from 1967 to 1970. Although each fund acquired Penn Central stock, Mutual bought at the highest prices and sold at the lowest, thus incurring the heaviest losses. All of the transactions were on the open market and at current trading prices.

Plaintiff has disclaimed all reliance on state law and therefore the court has before it only claims based on federal law. Plaintiff first alleges that on the advice of IDS the common directors of the three funds caused them to purchase stock of Penn Central as follows:

|  | Periods of Purchases | Number of Shares | Average Price Per Share |
|---|---|---|---|
| Variable | January 24–April 25, 1967 | 200,000 | $58.4635 |
| Stock Fund | June 8, 1967–February 26, 1968 | 320,000 | 65.4058 |
| Mutual | October 31, 1967–August 1, 1968 | 500,000 | 74.2863 |

Plaintiff claims that by causing Mutual to purchase later and at higher prices these directors and IDS gave "priority" to Variable and Stock Fund and violated an asserted duty, both statutory and contractual, to obtain for Mutual the same average price per share for Penn Central stock as the other two funds paid.

The second claim makes a similar allegation with respect to sales of Penn Central stock in 1969 and 1970. Plaintiff states that the following sales were made:

|  | Periods of Sales | Number of Shares | Average Price Per Share |
|---|---|---|---|
| Stock Fund | March 27, 1969–May 21, 1969 | 320,000 | $54.6256 |
| Variable | April 10, 1969 May 28, 1969 | 200,000 | 53.4079 |
| Mutual | June 13, 1969 May 27, 1970 | 500,000 | 26.9550 |

Plaintiff asserts that by causing Mutual to defer selling until later than the other two funds and then selling at lower prices the directors and IDS violated their alleged duty to obtain equality of treatment for Mutual.

On the first two claims plaintiff asks that Mutual's directors, IDS, Variable and Stock Fund pay over to Mutual sums sufficient to put it in the same position as if the purchase and sale prices for the Penn Central shares had been averaged between all three funds. Plaintiff also asks that these defendants account to Mutual for their "profits" and its damages.

The third claim alleges that by maintaining interlocking boards of directors IDS and the defendant directors deprived Mutual of independent investment advice, in violation of Section 8 of the Clayton Act, 15 U.S.C. § 19. Plaintiff asks that Mutual be required to take steps to insure that no member of its board is a member of the board of Variable or Stock Fund and to obtain an investment adviser independent of the adviser for the other two funds.

The fourth claim seeks relief solely against defendant Kirby and is not at issue on the present motion.

Defendants claim that while all three funds were advised by IDS, each fund traded in accordance with different investment objectives. Mutual, a so-called "balanced fund", described its objectives in its prospectuses as follows: "(1) to provide a reasonable return on its shareholders' investments; (2) to preserve the value of these investments; (3) to aim at long term appreciation possibilities on an investment rather than a speculative basis."

Stock Fund stated its primary objectives as "(1) capital appreciation on an investment basis over a long term and (2) a reasonable income consistent with the investment policies of the company."

Finally, Variable, a so-called "growth appreciation fund", stated that its objective is "to achieve capital appreciation" and that any "realization" of current income is "only incidental". Variable's prospectuses there-

fore stated that investments might be made in securities selling at prices "high in relation to earnings and dividends" or involving "a greater than average risk." Mutual's policies were said to be the most conservative, Stock Fund's less so, and Variable's the most speculative.

The proxy statements sent by Mutual (as well as by the other two funds) showed that IDS acted as investment adviser not only for all three funds but also for many other funds and entities. The proposed advisory agreement between IDS and Mutual was set forth in the proxy statements and recited that IDS advised others and would continue to have the right to do so. The agreements were approved annually by Mutual's shareholders. Mutual's prospectuses contained similar revelations, stating that the three funds had different investment policies and purposes, and advising that the shareholders of all three had the privilege of transferring without sales charge their investment in one fund into an investment in another at respective net asset values. The interlocking directorates were also revealed.

Jack Nienaber, Vice President of Fund Operations for IDS from April 1965 until January 1968, testified in his deposition to the considerations that led to the purchase and sale of Penn Central stock by each of the three funds. Mr. Nienaber stated that Variable purchased the stock beginning in January 1967, before the merger between the Pennsylvania Railroad and the New York Central had received the necessary administrative approval and judicial scrutiny. Although there was some risk in making the purchase in the event the merger was not consummated, he believed that taking such a risk was consistent with Variable's investment objective, which was exclusively capital appreciation.

Stock Fund began to purchase the stock several months later, when the merger was closer to being accomplished. Mr. Nienaber testified that because Mutual was the most "conservative" of the three funds it waited to begin until the merger was "almost an accomplished fact." He also said that Mutual's purchase was part of a "package of similar types of securities" which Mutual was then acquiring in order to improve the appreciation potential of its portfolio.

Mr. Nienaber also explained how the differing objectives of the three funds affected their respective decisions to sell the Penn Central stock.

In March 1969, it appeared that the Penn Central stock would not make a sufficiently substantial contribution to Variable's only objective, capital appreciation, and it was therefore eliminated from that portfolio.

The analysis of Penn Central made for Stock Fund in March 1969, showed that it would be "a nonperformer over the intermediate future" as to price. Thus, because the stock was no longer expected to appreciate faster than the market, it was eliminated from Stock Fund's portfolio.

Mr. Nienaber testified that the same facts led to a different conclusion for Mutual in light of its different investment objectives. In March 1969, when the decision to sell the other funds' holdings was made, a dividend of approximately $2.40 was being paid, a good return on the then-current market price, and there was a continued expectation of good, although long-term, appreciation. In light of Mutual's different investment objectives—reasonable return, preservation of capital and long-term appreciation—it seemed to him sensible to retain the stock in Mutual's portfolio.

Plaintiff disputes defendants' contention that the transactions accorded with the fund's stated investment objectives. Moreover, she alleges that IDS acted in order to further its own interests and those of its chairman, Fred M. Kirby, II, rather than those of Mutual. Plaintiff alleges that the Kirby family's holdings of Penn Central stock amounted to 586,325 shares, approximately one half of which were held by the Alleghany Corporation, in which the Kirby family had a controlling interest. Thus, plaintiff claims that Kirby used his influence as chairman of the board of IDS to manipulate Mutual's holdings of Penn Central thereby stabilizing the price of the stock and preserving the value of his family's investment.

As evidence, plaintiff cites a telephone conversation between Kirby and defendant Stuart F. Silloway, president of IDS and a director of all three funds. Silloway testified in his deposition that in the course of a conversation about Penn Central stock in June or July 1969, Kirby stated words to the effect of "[m]aybe you will see some improvement yet." Although Kirby did not indicate that the funds should delay selling the stock, the information was relayed to Mr. Nienaber and appears to have had some effect on IDS's decision to delay selling Penn Central stock.

Plaintiff also notes that on July 15, 1969 Kirby received a memorandum in his capacity as a director of Alleghany Corporation from John J. Burns, Vice President of Alleghany, advising that Alleghany's Penn Central holdings be sold. However, the shares of the Kirby family were not sold until September 1970, several months after Mutual's shares were sold. Some Alleghany shares were sold on May 27, 1970, the same day Mutual completed its sales, but the majority of the Alleghany shares were not sold until January 1971, after Penn Central had become bankrupt.

With respect to IDS, plaintiff claims that IDS not only acted to further the interests of the Kirby family but also to increase the total asset value of Stock Fund's and Variable's portfolios and thereby increase the basis for IDS's investment advisory fee. Furthermore, plaintiff alleges that defendants Stock Fund and Variable acted through their interlocking directors to deprive Mutual of a fair opportunity to buy and sell Penn Central stock in order to drive up the value of their own shares.

Defendants IDS and the individual defendants other than Kirby now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure or in the alternative pursuant to Rule 12(b)(6) for dismissal for failure to state a claim upon which relief can be granted. Defendants Variable and Stock Fund have joined in defendant IDS's summary judgment motion and move separately to dismiss for failure to state a claim under Rule 12(b)(6).

*Discussion*

A. *Claims Under Section 10(b) and Rule 10b–5*

■ Plaintiff alleges several frauds under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, making it unlawful to employ "in connection with the purchase or sale of any security" any "manipulative or deceptive device or contrivance" contrary to SEC rules, and Rule 10b–5 issued under that section. The rule, quoted in the margin,* makes it unlawful to employ any scheme to "defraud" or to engage in any act which operates as a "fraud" on any person "in connection with the purchase or sale of any security."

Plaintiff claims fraud primarily in the delay in selling Mutual's Penn Central shares. She says that Kirby, aided and abetted by IDS and the defendant directors, manipulated Mutual's investment portfolio to protect his family's Penn Central holdings by inducing Silloway to cause Mutual to refrain from selling in June 1969. Kirby is not a party to the motion before the court, but in order to establish aider and abettor liability, plaintiff must first show that Kirby committed a violation. *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir. 1978). *See also Edwards & Hanley v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir. 1979). To satisfy this requirement, plaintiff must show three elements: (a) that a manipulative or deceptive device was used; (b) scienter;

---

* It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

and (c) that the device was employed in connection with the purchase or sale of a security.

Assuming that plaintiff has raised triable issues of fact with respect to the first two elements, the alleged fraud was not in connection with the purchase or sale of a security. In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court adopted the Second Circuit's *Birnbaum* rule, *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and held that only those plaintiffs who have actually purchased or sold securities may bring an action under Rule 10b–5.

To be sure, in *Blue Chip Stamps* the Court stressed that the underlying purpose of the purchase or sale requirement is to exclude a class of plaintiffs who did not trade in a security at all, and whose claim accordingly rests entirely on uncorroborated oral testimony. 421 U.S. at 737–50, 95 S.Ct. 1917. But both Section 10(b) and the rule are clear that the fraud must be "in connection with the purchase or sale of securities", and the *Blue Chip Stamps* opinion recites that it is not enough to allege that a shareholder "decided not to sell . . . shares because of an unduly rosy representation or a failure to disclose unfavorable material." 421 U.S. at 737–38, 95 S.Ct. at 1926.

Plaintiff thus may not make a Rule 10b–5 claim because of Mutual's delay in selling.

■ With respect to the purchases of Penn Central Stock, plaintiff may not hold as principals either IDS or the defendant directors other than Kirby. Plaintiff says that IDS purchased the shares in order to increase the total asset value of Variable and Stock Fund's portfolios upon which IDS's advisory fee was based. Plaintiff has presented no evidence tending to support such an allegation. Indeed, it is difficult to imagine how such a scheme would have been to IDS's advantage since it used the same formula for computing its fee for each fund. IDS would have lost as much from Mutual as it gained from Variable and Stock Fund.

Nor is there the slightest basis for plaintiff's Section 10(b) claim against Stock Fund and Variable. Plaintiff has offered no evidence to support her allegation that those funds caused Mutual to purchase Penn Central stock in order to raise the value of their own holdings.

Although doubts must be resolved against the moving party on a motion for summary judgment, *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972), "conclusory allegations" and "unsubstantiated assertions" are insufficient to compel a trial. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

B. *Claims Under The Investment Company Act*

1. *Sections 17(d) and 36*

Apparently relying on Section 17(d), 15 U.S.C. § 80a–17(d), and Section 36 as it existed prior to the 1970 amendments to the Investment Company Act, 15 U.S.C. § 80a–35, plaintiff claims that Mutual and the two other funds should have been treated identically.

Section 17(d) makes it unlawful for any "affiliated person" of an investment company, or any affiliated person of such person, to effect any transaction in which the investment company is a "joint or a joint and several participant" with such affiliated person without first obtaining the approval of the SEC. 15 U.S.C. § 80a–17(d), and Rule 17d–1, C.F.R. Reg. § 270.17d–1.

Section 36 authorized the SEC to seek an injunction against directors, officers or investment advisers who are "guilty . . . of gross misconduct or gross abuse of trust."

Plaintiff argues that there is a "rule against purchases involving divided loyalty" that requires separate funds in a mutual fund complex to be treated as a single entity whenever they trade in the same security. The claim appears to turn pri-

marily on IDS's practice of averaging the price of a security when a number of funds traded in it on the same day. IDS did not average transactions that were merely contemporaneous, and plaintiff claims it should have done so.

■ There is nothing in the sections cited which requires such averaging. Indeed, the SEC in its *amicus* brief filed at the request of the court points out that the practical result of plaintiff's contention, that funds with a common adviser who buy and sell the same security have to pay or receive the same price, would be that such funds could not invest in the same security unless they acted in concert, which would probably violate Section 17(d) of the Investment Company Act unless approved in advance by the SEC. Moreover, to require the funds to pay or receive the same price would seriously restrict advisers in deciding whether to buy or sell a security to meet the investment objectives of a particular fund.

■ Neither Section 17(d) nor Section 36 gives support to plaintiff's argument for holding Variable and Stock Fund that the three funds were co-beneficiaries under identical investment advisory contracts and that thus their interlocking directorates should be held to have established in equity a single trust through which the identical stock is bought and sold for each company. Nothing in the Investment Company Act establishes this fiduciary relationship, and plaintiff cites only state decisions in support of the claim.

■ Plaintiff also claims that defendants Variable and Stock Fund, being "affiliated persons" within the meaning of Section 17(d) violated the section by "causing" Mutual to purchase and sell Penn Central stock on a disadvantageous basis. Stock Fund and Variable are said to be "affiliated persons" by virtue of either their interlocking directorates or their common control by IDS. Moreover, the ownership of more than 5% of IDS's voting stock by Alleghany is said to create "affiliation throughout the entire group of companies." Plaintiff contends that the purchase by the three funds of the Penn Central shares effected a transaction among "officers", in which transaction each fund was a "joint or joint and several participant", all in violation of Section 17(d) since no SEC approval was obtained.

Even if the three funds are deemed "affiliated persons" as defined by Section 2(a)(3) of the Investment Company Act because under "common control" within the meaning of Section 2(a)(9), plaintiff has not made out a case under Section 17(d). A prerequisite to liability under that section is that there be "joint" participation in a transaction. Plaintiff argues that the purchases of the same stock by the three funds, coupled with the interlocking directorates and the fact that the IDS reports mentioned the holdings of all three funds prove that there was a "joint" enterprise.

But Section 17(d) requires an intentional act of agreement or at least a consensual pattern. Thus, Rule 17d–1, C.F.R. Reg. § 270.17d–1 defines "joint enterprise" as: "any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking." Those cases in which liability has been imposed under Section 17(d) have found considerably more in terms of combination than the mere purchase and sale of securities on the open market by distinct investment companies. The opinions have stressed that "some element of 'combination' is required." *See, e. g., SEC v. Talley Industries, Inc.,* 399 F.2d 396, 403 (2d Cir. 1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 615, 21 L.Ed.2d 560 (1969); *SEC v. Midwest Technical Development Corp.* [1961–1964 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,252 at p. 94,147 (D.Minn.1963).

Plaintiff has presented no evidence that tends to show a "joint enterprise". In light of this fact it is unnecessary to consider whether plaintiff's Section 17(d) claim is untimely.

■ Plaintiff also asserts that IDS, the directors and the officers are liable under Section 36 as it stood prior to 1970 because they were guilty of "gross misconduct or gross abuse of trust". As noted above, that

section merely authorizes the SEC to seek an injunction to prohibit such "gross" misconduct. However, the Second Circuit has recognized a private right of action under that section. *Tannenbaum v. Zeller*, 552 F.2d 402, 417 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977). *See also Moses v. Burgin*, 445 F.2d 369, 373 (1st Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); *Tanzer v. Huffines*, 314 F.Supp. 189, 193 (D.Del.1970).

Most of the opinions interpreting the terms "gross misconduct" and "gross abuse of trust" have been concerned with the failure of an investment adviser to recapture brokerage commissions, and are therefore not directly applicable here. Nevertheless, those cases in which liability was found did involve some element of self-dealing or personal advantage. *See, e. g. Tannenbaum v. Zeller*, 552 F.2d at 406; *Fogel v. Chestnutt*, 533 F.2d 731, 750 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Aldred Inv. Trust v. SEC*, 151 F.2d 254, 260 (1st Cir.), *cert. denied*, 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1946). *See also Rosenfeld v. Black*, 445 F.2d 1337, 1346 (2d Cir. 1971), in which the Court of Appeals stated that Section 36 is "clearly addressed to highly reprehensible conduct."

That the section was intended to apply to situations where the defendants acted for their personal advantage is also suggested by the policy declarations of the Investment Company Act, 15 U.S.C. § 80a–1(b)(2), which recite, among other things, that the national public interest and the interest of investors are adversely affected:

> when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers . . . rather than in the interest of all classes of such companies' security holders . . . .

The thrust of the legislation was to combat self-dealing in the mutual fund industry, rather than to codify the general fiduciary duties of directors, officers and investment advisers. *See also Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780 (7th Cir. 1977).

The 1970 amendments to Section 36(a) lend further support to construing "gross misconduct" and "gross abuse of trust" to mean self-dealing. The section now proscribes any "breach of fiduciary duty involving personal misconduct." The Senate report indicates that the amendment was made because the old standard required proof of more serious wrongdoing than was deemed desirable. S.Rep.No.184, 91st Cong., 2d Sess. 36, U.S. Code Cong. & Admin. News 1970, p. 4897.

Plaintiff's allegations against the directors other than Kirby fall short of claiming self-dealing. The only assertion of self-dealing against IDS is that it acted to raise the basis of its investment advisory fee, but no evidence has been offered to support this contention.

### 2. Sections 15(a), 17(h) and 17(i)

Plaintiff's chief contention under the Investment Company Act is based on Sections 15(a), 17(h) and 17(i). Section 15(a), 15 U.S.C. § 80a–15, among other things, makes it unlawful for an investment adviser to act except pursuant to a written contract. Section 17(h), 15 U.S.C. § 80a–17(h), bars any provision protecting an officer or director "against any liability to the company or to its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office." Section 17(i), 15 U.S.C. § 80a–17(i), contains a similar provision regarding investment advisers.

Plaintiff seeks to transform this statutory prohibition against exculpatory provisions in the contracts of investment advisers into a federal claim for relief for "gross negligence". Thus, she claims that in failing to have Mutual sell its Penn Central stock at the time that Variable and Stock Fund sold, IDS and the defendant directors were guilty of "gross negligence" and therefore liable under Sections 17(h) and 17(i).

A private party can, of course, sue to nullify an exculpatory clause obtained in

violation of these sections. *See Chabot v. Empire Trust Co.*, 301 F.2d 458 (2d Cir. 1962). But there is no indication in the legislative history that Congress intended by these unambiguous provisions to create a federal claim for gross negligence. Similarly, while private parties can sue to insure that there is meaningful compliance with the letter of Section 15(a), *see, e. g., Brown v. Bullock*, 294 F.2d 415, 421 (2d Cir. 1961), nothing cited by plaintiff suggests that this section was intended to make the breach of an investment advisory contract a matter of federal law.

The opinion in *Brown v. Bullock*, 194 F.Supp. 207, 237–47 (S.D.N.Y.), *aff'd on other grounds*, 294 F.2d 415 (2d Cir. 1961), is not authority to the contrary. In that case the District Court held that taken together Section 36 and Sections 17(h) and 17(i) provide "interpenetrating sanctions" against gross misconduct and gross abuse of trust. The opinion did not find a separate action under Section 17 for gross negligence; rather, it treated Section 17 as a provision designed to insure that liability under Section 36 not be waived.

Whether or not the allegations of gross negligence and breach of contract state a claim for relief under state law, they are not cognizable in this action.

### 3. *Section 20(a)*

Plaintiff alleges violations under Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a–20, making it unlawful to solicit any proxy or consent or authorization in respect of a security of a registered investment company in contravention of SEC rules, and Rule 20a–1 which make the proxy rules of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, applicable to securities issued by a registered investment company.

Plaintiff contends first that Mutual's prospectuses and its proxy statements for 1967 seeking shareholder approval of the investment advisory contract were deficient because they failed to disclose that Stock Fund and Variable were to be given "priority" under the investment advisory contracts.

■ As to the prospectuses, Mutual cannot recover for deficiencies in its own prospectuses in a derivative action brought on its own behalf. *See Tannenbaum v. Zeller*, 552 F.2d at 429.

■ As to the proxies, this contention of plaintiff is premised on the claim that IDS had a duty to average the funds' Penn Central transactions. Since averaging is not required under the Investment Company Act, there can be no liability for failure to disclose that such a practice would not be adopted.

■ Plaintiff also alleges that the failure to disclose that Mutual paid the highest and received the lowest prices for Penn Central stock violated the proxy rules. Since it was impossible to know what would happen to the value of the stock at the time the proxies were solicited, in practical terms plaintiff's argument is that each and every investment made during the course of a year must be disclosed to the shareholders. While the question of materiality is generally one of fact, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), requiring such disclosure would "tend to defeat the purposes of the proxy rules by 'bury[ing] the shareholder in an avalanche of trivial information—a result that is hardly conducive to informed decision making.'" *Tannenbaum v. Zeller*, 552 F.2d at 433, *quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 448, 96 S.Ct. at 2132.

■ Finally, plaintiff says in her brief (though not in the amended complaint) that the failure in the 1967 proxy to disclose the Kirby family's controlling interest in Penn Central violated the proxy rules. Assuming that this information was material, *i. e.* that a reasonable shareholder would have considered it important in deciding how to vote on approval of the investment advisory contract, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132, plaintiff must still show that her damage was "caused" by the transaction approved on

the basis of misleading proxy material. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381–84 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). In other words, plaintiff must establish that she was damaged by an infringement of her corporate suffrage rights. *Markewich v. Adikes*, 422 F.Supp. 1144 (E.D.N.Y.1976). The proxy rules are intended to require an "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." *Mills v. Electric Auto-Lite Company*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970), quoting from H.R.Rep. No.1383, 73d Cong., 2d Sess. 14.

The only question for which the proxies in this case sought authority was approval of the investment advisory contract. The shareholders were not asked to vote on whether or not any particular shares of any particular corporation should be bought or sold. Perhaps it could be argued that if the contract had not been approved the purchases and sales of Penn Central stock would not have been made and Mutual would not have had the losses complained of.

But Congress in adopting the proxy requirements could not have had any such remote causal relationship in mind. The web of causation is infinite, and in one sense everything is connected to everything else. But to impose liability for an act or omission what damages it "caused" in a legal sense must be determined on pragmatic grounds, considering both the foreseeable consequences of the dereliction and its fair relationship to the eventual loss.

It may be that if plaintiff could show a conspiracy to obtain approval of the investment advisory contract as one step in an effort to maintain the price of the Penn Central stock in order to advantage the Kirby family, the proxy solicitation would have been "an essential link" in accomplishing that objective. *See Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d at 383. But plaintiff's counsel disclaimed on oral argument the existence, and there is no proof of, such an elaborate conspiracy. He stated "I think that all there was here was gross negligence as far as giving us the word to buy and giving the word to sell."

Under the circumstances any causal relationship between the alleged proxy violation and Mutual's loss is far too remote to justify the imposition of liability.

## C. *Claims Under the Clayton Act*

Finally, plaintiff contends that the interlocking directorates of the defendant mutual funds violated Section 8 of the Clayton Act, 15 U.S.C. § 19, which provides that:

No person at the same time shall be a director in any two or more corporations . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws.

Plaintiff argues that mutual funds within a single fund complex are in competition with one another. However, the mutual fund industry tends to be organized into mutual fund complexes. These complexes, such as the IDS complex, usually consist of distinct mutual funds each with its own investment objectives and managed by a single investment adviser and an interlocking board of directors. Thus, competition within the mutual fund industry seems to be primarily between different mutual fund complexes, rather than individual funds within a single fund complex. Indeed, none of the three funds in this case appears to compete with the others. Each has different objectives and presumably competes with funds with like objectives and with other advisers.

Even if the funds were competitors within the meaning of the Clayton Act, the Investment Company Act establishes a comprehensive regulatory scheme which makes the antitrust laws inapplicable. Application of the antitrust laws would interfere with this scheme, especially since the Investment Company Act allows mutual fund complexes, and Congress is aware of the fact that interlocking directorates are commonly employed. S.Rep.No.184, 91st Cong., 2d Sess.

*See, e. g., United States v. National Assn. of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), in which the Supreme Court held that the antitrust laws are inapplicable to the SEC's authority under Section 22 of the Investment Company Act.

Thus, plaintiff has failed to state a claim for relief under the Clayton Act.

*Conclusion*

Plaintiff has shown no grounds for relief. The motion for summary judgment is granted, and the complaint is dismissed as to the moving defendants. So ordered.